RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0093P (6th Cir.)
File Name: 03a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

SAHAR OUDA,

        *Petitioner,*

    *v.*

IMMIGRATION AND
NATURALIZATION SERVICE,

        *Respondent.*

No. 01-3869

On Appeal from the Executive Office
for Immigration Review, Board of Immigration Appeals.
No. A73 400 089.

Submitted: February 5, 2003

Decided and Filed: March 31, 2003

Before: GILMAN and GIBBONS, Circuit Judges;
POLSTER, District Judge.

———————————

**COUNSEL**

**ON BRIEF:** Noel J. Saleh, SALEH & SALLEY, Detroit, Michigan, for Petitioner. Susan K. Houser, Richard M.

---

* The Honorable Dan Aaron Polster, United States District Judge for the Northern District of Ohio, sitting by designation.

---

Evans, UNITED STATES DEPARTMENT OF JUSTICE, OFFICE OF LITIGATION, Washington, D.C., for Respondent.

———————————

**OPINION**

———————————

DAN AARON POLSTER, District Judge. Petitioner Sahar Ouda seeks judicial review of a decision by the Board of Immigration Appeals ("BIA") affirming the Immigration Judge's denial of her application for asylum. For the reasons set forth below, the judgment of the BIA is **REVERSED** and the case is **REMANDED** to the BIA for further proceedings consistent with this opinion.

## I. Background

Sahar Ouda is a stateless Palestinian born in Kuwait on February 26, 1971.[1] In July of 1992, Ouda, her parents and her two younger brothers departed Kuwait for Bulgaria on one-month visitors' visas. They remained in Bulgaria, where they overstayed their visas by two years. On December 7, 1994, Ouda entered the United States by way of a nonimmigrant visitor's visa with an expiration date of June 6, 1995. One month prior to the expiration of her visa, Ouda filed an application for asylum. On July 11, 1995, the Immigration and Naturalization Service ("INS") issued an order to show cause and a notice of hearing, charging Ouda as deportable for overstaying her visa. On the application form, Ouda claimed mistreatment by the Kuwaiti government as the basis of her request for asylum. She asserted that her life and liberty will be in danger if she goes back to Kuwait or to Egypt because "I cannot go anywhere."

---

[1] Ouda has a daughter who is a U.S. citizen, having been born in the United States in 1995. Her husband abandoned her five weeks after they were married in Bulgaria.

At the initial deportation hearing, Ouda, through counsel, conceded deportability on the basis that she overstayed her visa. However, she renewed her request for asylum and, in the alternative, for voluntary departure. When asked, she declined to identify a country to which her deportation should be directed, at which point the INS suggested Egypt on the basis that she entered the United States with an Egyptian travel document.

In November of 1997, the Immigration Judge ("IJ") conducted a hearing on Ouda's application for asylum. There was some confusion regarding the country from which Ouda was claiming asylum. Ouda asserted that she was a refugee from Kuwait, the country in which she was born and raised and from which she and her family were expelled. The INS took the position that Ouda's asylum claim arose from Bulgaria, the country where she last resided before entering the United States. Ouda argued that Bulgaria should not be the focus of her asylum claim because she was never a citizen of Bulgaria and Bulgaria would not take her back in any event. In support of this last assertion, she provided a letter from the Embassy of the Republic of Bulgaria, dated January 21, 1997, wherein the Embassy refused her family's request for a visa. The IJ reserved ruling on this legal issue until after the hearing.

Ouda then testified to the following: During the Gulf War, her father, who had taught in Kuwait's Department of Education for twenty years, was forced to continue teaching by the Iraqi occupiers. When Kuwait was liberated, the Kuwaitis refused to let him return to his teaching position because he was perceived as a Palestinian who supported Iraq. Notices were posted on all businesses stating that only Kuwaiti citizens were permitted to return to work. Because Ouda's father was unable to earn a living, he requested his pension fund from the Department of Education and was told that he could collect it only if he left the country. Not only were the Oudas unable to earn a living, they were also unable to attend school, obtain a driver's license or drive a car. Ouda explained that access to water was not "open" as it is in the

United States, and if the Oudas lined up to get water and people found out they were Palestinians, the Kuwaitis would dump their water. Because they could not work, they were forced to sell furniture to buy food – which was problematic in any event because there were signs up saying that only Kuwaitis were allowed to buy food. At the time, many armed Kuwaitis roamed the streets, announcing that if they found any Palestinians on the road, they would kill them. Numerous children who left their homes never returned. Because of this, only Ouda's father was permitted to leave the house. On more than one occasion when he left the home to obtain food, he was threatened at gunpoint. On July 4, 1992, Kuwaiti officials stamped a date (July 31, 1992) on the Oudas' travel documents by which time they would have to leave the country.[2] The officials threatened that if the Oudas were not gone by that date, they would be placed on the country's border. Just before the deadline, Ouda's fifteen-year old brother attempted to leave the house to get a haircut. He was abducted by Kuwaitis, demeaned and beaten on his knees and feet because he was a Palestinian. Shortly thereafter, the Oudas bribed a Bulgarian to get them visitors' visas to Bulgaria and left the country prior to the deadline. An older brother and sister of Ouda's stayed behind to sell the family's furniture because the family needed the money. One month later, when they applied for visas to Bulgaria, their applications were denied. As of the time of the hearing, Ouda's siblings, who do not have telephones, were still believed to be in Kuwait. Ouda has spoken to her sister once since entering the United States.

In Bulgaria, Ouda's family tried to extend their one-month visas to no avail, and they were unable to apply for citizenship. Apparently, however, the Oudas learned that they could gain temporary resident status if they owned an ongoing business. Accordingly, Ouda's father opened a store with what remained of his retirement funds. As long as the

---

[2] Ouda provided her Egyptian travel document to show that she was required to leave Kuwait by July 31, 1992.

business was in operation, they were permitted to stay in Bulgaria and run it. Unfortunately, the Oudas ran into another obstacle. The Bulgarian mafia told them they didn't want anyone there but Bulgarians and threatened to harm them if they didn't leave the country. The mafia attempted to extort protection funds from her father in lieu of torture and destruction of his business, but her father refused. The Oudas again found their safety compromised on the streets of Bulgaria;[3] consequently, they traveled only by taxi. On the rare occasions when Ouda walked along the streets of Bulgaria in Muslim dress, people would taunt her and try to take off her scarf. Because Ouda's father would not give protection funds to the mafia, the mafia beat up both of his sons, one of whom still retains scars from the experience. When the Oudas reported their problems with the mafia to the authorities, they were told they had no status in Bulgaria and should leave. The Oudas' problems continued until one day, the mafia burned their store down. Immediately thereafter, the Oudas obtained visitors' visas to the United States and, after selling their personal belongings to purchase tickets to America, left Bulgaria.

Ouda testified that she has attempted to get visas to go to other countries but, based on her status as a stateless Palestinian, has been denied entrance to Egypt, Bulgaria, Kuwait, Jordan and Israel. She stated that she feared for her life if deported to Kuwait.

The IJ subsequently issued a written opinion wherein he denied Ouda's application for asylum and withholding of deportation and ordered her deported to Bulgaria or any other country willing to accept her. In so ruling, the IJ determined that Bulgaria was Ouda's country of last habitual residence;

---

[3]In addition to threats from the mafia, Ouda testified that the Bulgarian people held widespread demonstrations "against us;" but she never explained whether the Bulgarians were protesting the presence of Kuwaiti or Palestinian refugees, Muslims or unauthorized foreigners in their country.

therefore, the focus of her asylum claim must be on Bulgaria. With regard to Ouda's credibility, he stated:

> In this particular case I have no reason to doubt the veracity of [Ouda]. She appears to be, in the estimate of the Court, to be credible and what she has testified to appears to be accurate, lacking of any outward indicia of fabrication, is consistent with her prior documents, and I do believe that her version as she indicates is, in fact, accurate.

Nonetheless, he concluded that Ouda had not demonstrated either past persecution or a well-founded fear of future persecution in Bulgaria. He noted that Ouda herself had never been harmed in Bulgaria and that the Bulgarian mafia's extortion attempts were directed at her father because he was a store owner, a characteristic that is not protected by the asylum laws.

Ouda appealed the denial of her asylum application to the BIA, arguing that the IJ had erred in finding that Bulgaria was her country of last habitual residence, and contending that she had established eligibility for asylum in relation to Kuwait. The BIA ruled, in relevant part:

> An alien may apply for asylum in the United States or withholding of deportation from any countries to which he or she may be deported. 8 C.F.R. § 240.49(c)(2). A stateless alien, who has no nationality, may seek asylum in relation to the country where she last habitually resided if he or she may be deported there. *Id*.; Section 101(a)(42)(A) of the Act.

> For purposes of deciding this appeal, we will assume that the respondent is correct that she may consider Kuwait as the country where she last habitually resided. Thus, if Kuwait is a country to which the respondent may be deported, she may base an asylum claim on past persecution or a well-founded fear of future persecution in Kuwait. However, the respondent herself stated that, at least as of the time of her hearing, Kuwait will not

accept her (Tr. at 29, 48). The State Department's Advisory opinion agrees that her chance of receiving the requisite Kuwaiti approval to re-enter was "quite slim" (Exh. 5, Tab 2). Accordingly, to the extent that the Immigration Judge may have erred in ruling that the respondent could only seek asylum with respect to Bulgaria, such error is seemingly harmless, as it is unlikely that Kuwait is a country to which the respondent may be deported.

Moreover, assuming *arguendo* that the respondent and the State Department are wrong, and the Service is able to procure travel documents for the respondent from Kuwait, we find that she has not established an asylum claim in relation to that country. We note that the respondent did focus her asylum claim on Kuwait in her written application and her testimony. She does not contend on appeal that there is more evidence that she wished to present concerning persecution in Kuwait. The only harm alleged in her written application related to the authorities' picking up of her brother in 1991 following Kuwait's liberation at the conclusion of the Gulf War. The respondent testified orally that she is not a member of any groups, political or otherwise (Tr. at 31). She further stated that she herself has never been arrested, detained, interrogated, imprisoned or beaten anywhere by any authorities (Tr. at 32-33). The only negative thing that happened to her in Kuwait is that she was unable to continue her higher education. However, discrimination does not ordinarily amount to persecution within the meaning of the Act. *Tamas-Mercea v. Reno*, 222 F.3d 417 (7th Cir. 2000); *Korablina v. INS*, 158 F.3d 1038 (9th Cir. 1998); *Ghaly v. INS*, 58 F.3d 1425 (9th Cir. 1995). Thus, having reviewed the entire record de novo, we find that she has not established past persecution in Kuwait.

Because she has not established past persecution in Kuwait, she enjoys no presumption to a well-founded fear of future persecution on account of her status as a

Palestinian in that country. 8 C.F.R. § 208.13(b)(1). Rather, she has the burden of showing a "reasonable possibility" of suffering persecution if returned to Kuwait. 8 C.F.R. § 208.13(b)(2)(i)(B). To make such a showing, the alien must establish that a reasonable person in his or her circumstances would fear persecution. *Matter of Kasinga*, 21 I&N Dec. 357 (BIA 1996); *Matter of Mogharrabi*, 19 I&N Dec. 439 (BIA 1987). *See also INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987). The lack of any evidence in this regard is not surprising in light of her position that Kuwait will not allow her return.

The State Department's advisory opinion notes that, for the most part Palestinians in Kuwait who are there legally are settling into a relatively stable existence free from egregious human rights abuses (Exh. 5 at tab 2). To the extent that the State Department's opinion may paint an overly optimistic picture, it is essentially all we have in this record regarding the current fate of Palestinians in Kuwait. The respondent has provided no objective evidence to meet her burden in this regard. We additionally note that 2 of her siblings have remained in Kuwait without any asserted harm. *Matter of A-E-M*, 21 I&N Dec. 1157 (BIA 1998) (the reasonableness of an alien's fear of persecution is reduced when his family remains in his native country unharmed for a long period of time after his departure). Thus, in the unlikely event that the respondent could be deported to Kuwait, we also find that she has not demonstrated a well-founded fear of persecution in that country. Accordingly, as the respondent did not meet her burden of establishing an asylum claim in relation to Kuwait, her appeal is dismissed.

It is from the BIA's decision that Ouda appeals.

## II.    Standard of Review

The BIA's decision "must be upheld if 'supported by reasonable, substantial, and probative evidence on the record

considered as a whole.' " *Mikhailevitch v. INS*, 146 F.3d 384, 388 (6th Cir. 1998) (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992)). Under this deferential standard, the court "may not reverse the Board's determination simply because we would have decided the matter differently." *Id.* (citing *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992)). The court may reverse, however, if the evidence presented by Ouda "not only supports a contrary conclusion, but indeed *compels* it." *Id*. (emphasis in original). As such, the petitioner must show that the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution. *Elias-Zacarias*, 502 U.S. at 483-84.

The Attorney General has discretion to grant asylum to a person who qualifies as a "refugee" within the meaning of Section 101(a)(42)(A) of the Immigration and Nationality Act. The Act defines a refugee as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion, . . . .

8 U.S.C. § 1101(a)(42)(A). Resolution of a request for asylum thus involves a two-step inquiry: "(1) whether the applicant qualifies as a 'refugee' as defined in § 1101(a)(42)(A), and (2) whether the applicant 'merits a favorable exercise of discretion by the Attorney General.' " *Mikhailevitch*, 146 F.3d at 389 (quoting *Perkovic v. INS*, 33 F.3d 615, 620 (6th Cir. 1994)).

The asylum applicant bears the burden of establishing that he or she qualifies as a refugee "either because he or she has suffered past persecution or because he or she has a well-founded fear of future persecution." 8 C.F.R.

§ 208.13(b). "The testimony of the applicant, if credible, may be sufficient to sustain the burden of proof without corroboration." 8 C.F.R. § 208.13(a). Acknowledging that the relevant statutes and regulations offer no working definition of persecution, we have previously held that the term encompasses "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch*, 146 F.3d at 390. The asylum applicant who satisfies the burden of establishing past persecution is presumed to have a well-founded fear of future persecution. *Id.* at 389 (citing 8 C.F.R. § 208.13(b)(1)(i) (1997)). The INS may rebut that presumption by establishing by a preponderance of the evidence that since the persecution occurred, conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted upon return. *Mikhailevitch*, 146 F.3d at 389. The INS must do more than show that circumstances in the country have fundamentally changed; the INS must also show that such change negates the particular applicant's well-founded fear of persecution. *Id*. See also *Krastev v. INS*, 292 F.3d 1268, 1276-77 (10th Cir. 2002) (BIA must conduct individualized well-founded fear analysis); *Chand v. INS*, 222 F.3d 1066, 1079 (9th Cir. 2000) (whether or not a particular applicant's fear is rebutted by a general change in country conditions requires an individualized analysis that focuses on the specific harm suffered and the relationship to it of information contained in a country report); *Fergiste v. INS*, 138 F.3d 14, 19 (1st Cir. 1998) (general evidence of changed country conditions is insufficient to show that an applicant no longer has a well-founded fear of persecution); Charles Gordon et al., Immigration Law & Procedure § 34.02[9][d] (Rev. ed. 2002).

### III.  Analysis

#### A.

The BIA found, as a preliminary matter, that Ouda could not seek asylum from Kuwait because she testified that

Kuwait would not accept her. The INS's brief on appeal appears to support this ruling:

> The petitioner argues that she should be granted asylum from Kuwait, but the parties agree that the petitioner does not currently have travel documents or permission from the Kuwait government to enter that country. The petitioner herself argued below that Kuwait will not allow her to return.

However, the INS cites no authority for this purported linkage and the BIA cites only 8 C.F.R. § 240.49(c)(2) and 8 U.S.C. § 1101(a)(42)(A). After consulting various immigration treatises and manuals, reviewing the asylum statutes and regulations, and researching the case law in all circuits, we can find no support for the proposition that an asylum applicant is precluded from seeking asylum in the United States should it prove to be the case that the country from which she seeks asylum will not take her back if the INS tries to deport her. Moreover, since the INS apparently takes the view that the actual deportability of an alien is irrelevant to the issue of whether the alien qualifies as deportable, it stands to reason that the actual deportability of an alien is equally irrelevant to the issue of whether she qualifies as a refugee.

The regulation cited by the BIA in support of its ruling, 8 C.F.R. § 240.49(c)(2), addresses the obligations of an Immigration Judge in a deportation hearing who is presented with a deportable person expressing a fear of persecution if deported to a certain country. The regulation begins:

> If the alien expresses fear of persecution or harm upon return to any of the countries to which the alien might be deported . . ., and the alien has not previously filed an application for asylum or withholding of deportation that has been referred to the immigration judge by an asylum officer in accordance with § 208.14 of this chapter, the immigration judge shall: . . . .

8 C.F.R. § 240.49(c)(2). Nothing in this regulation precludes an asylum applicant who cannot be deported to the country

from which she fled (or, as in this case, was ordered to leave) from seeking refuge in the United States. This regulation does not even apply to Ouda, who sought asylum as a Kuwaiti refugee while lawfully within this country, well before her visa expired and the INS commenced deportation proceedings against her. Less compelling is the BIA's citation to 8 U.S.C. § 1101(a)(42)(A), the refugee-defining statute, which provides that the asylum applicant must be unable or unwilling to return to the country, presumably from which she is seeking asylum, based on past persecution or a fear of future persecution. 8 U.S.C. § 1101(a)(42)(A).

Nor does case law support the BIA's determination that Ouda cannot seek asylum from Kuwait because she cannot be deported there. Asylum applicants have argued that a country's refusal to accept them is further evidence of persecution. *See, e.g., Al Najjar v. Ashcroft*, 257 F.3d 1262 (11th Cir. 2001); *Faddoul v. INS*, 37 F.3d 185 (5th Cir. 1994). In *Al Najjar*, for example, petitioners (a married couple) argued that as stateless Palestinians they would be denied entry into their respective countries of last habitual residence, the United Arab Emirates and Saudi Arabia, and that such denials constituted a well-founded fear of persecution on account of nationality. 257 F.3d at 1292. The court rejected their arguments on the ground that petitioners had failed to show that entry would be denied to them based on their nationality as opposed to the law of those countries favoring citizenship based on ancestry or marriage. *Id*. at 1291-92. Importantly, neither the INS nor the court raised the possibility that these petitioners' asylum applications were barred as a matter of law on the basis that they could not be deported to these countries.

In short, the relevant question is whether Ouda qualified as a refugee at the time of her asylum hearing and, if so, whether the INS carried its burden of showing that conditions in Kuwait at that time had improved to such an extent that Ouda, given the circumstances of her past persecution, could no longer claim a well-founded fear of future persecution if returned there. The issue of her deportability is another

matter. For all these reasons, we find that the BIA erred by ruling as a matter of law that Ouda cannot request asylum from Kuwait because she cannot be deported there.

**B.**

We next review the BIA's finding that Ouda failed to establish past persecution in Kuwait. After reviewing the record and particularly Ouda's testimony, which the Immigration Judge found credible, we conclude that the evidence in the record compels the conclusion that Ouda has established past persecution in Kuwait.

The undisputed facts paint a grim picture of human rights violations in post-war Kuwait, for which the Oudas personally suffered. After Kuwait was liberated, Ouda's father was not allowed to return to work because he was a Palestinian who was perceived as supporting Iraq when he continued teaching during the war. Indeed, the Kuwaitis engaged in a general campaign to prohibit Palestinians from working, attending school, buying food, obtaining water or obtaining drivers' licenses. Many armed Kuwaitis roamed the streets, terrorizing, physically abusing and killing Palestinians. They held Ouda's father at gunpoint and threatened to kill him on more than one occasion when he tried to obtain food, and tortured her 15-year old brother when he tried to get a haircut. Because of the widespread violence against Palestinians, Ouda was not permitted to leave her home. When Ouda's father requested his retirement fund so that his family could survive, Kuwaiti officials told him they would only give it to him if he left the country. On July 4, 1992, Kuwaiti officials ordered the Oudas to leave the country by July 31, 1992 and stamped their travel documents accordingly. In short, the Oudas were not only harassed because they were Palestinians who were perceived enemies of Kuwait, they were unable to earn a livelihood or travel safely in public, forced to sell their belongings to buy food, and expelled from Kuwait with only a percentage of Mr. Ouda's pension.

There is no case law that requires Ouda to show that she was personally detained, interrogated, beaten up or tortured in

order to establish a claim of past persecution. "[P]ersistent death threats and assaults on one's life, family, and business rise to the level of persecution within the meaning of the Act." *Andriasian v. INS*, 180 F.3d 1033, 1042 (9th Cir. 1999) (citing *Singh v. INS*, 94 F.3d 1353, 1360 (9th Cir.1996)). "Persecution can include threats to life and economic restrictions so severe that they constitute a real threat to life or freedom." *Li Wu Lin v. INS*, 238 F.3d 239, 244 (2d Cir. 2001) (citing *Chang v. INS*, 119 F.3d 1055, 1066 (3d Cir. 1997)). Confiscation of property has been cited as one type of action that can cross the line from harassment to persecution. *Begzatowski v. INS*, 278 F.3d 665, 669 (7th Cir. 2002). The record evidence shows that the Oudas were threatened and beaten up, and that they were deprived of food, water, a livelihood and the ability to leave their house because they were Palestinians. The Kuwaiti government confiscated a significant portion of Mr. Ouda's retirement funds when expelling his family from the country. The mere fact that the Oudas were ordered by the government to leave Kuwait because they were perceived enemies of their country is sufficient alone to establish past persecution. *Andriasian v. INS*, 180 F.3d 1033, (9th Cir. 1999) (holding that a warning that asylum applicants would be killed if they did not leave Azerbaijan immediately is sufficient to establish past persecution). Under the circumstances, no reasonable factfinder could fail to find that the Oudas were persecuted. *Elias-Zacarias*, 502 U.S. at 483-84.

Even the State Department's letter corroborated Ouda's claims of persecution. According to James Halmo, Director of the Office of Asylum Affairs:

It is well-established that the Palestinian population which remained in Kuwait until the Iraqi forces were expelled on February 28, 1991 suffered gross abuses in the immediate aftermath of the liberation of Kuwait from Iraqi occupation. Roving bands of Kuwaiti vigilantes, elements from the police and army routinely apprehended and physically abused Palestinians. Many Palestinians were killed outright, probably in excess of 40-50. The

reason for this widespread abuse lay in the Kuwaiti perception, rightly or wrongly, that the Palestinians collaborated with the Iraqi invaders. While it is true that many Palestinians were deported or otherwise forced out of Kuwait when their residence permits came up for renewal post-February 1991, the majority of Palestinians holding Jordanian passports who fled into Jordan left before the liberation of the country on February 28, 1991. In any case, we believe that the worst of the abuses, certainly the gross physical abuses and unwarranted detentions, ended by the end of 1991.

With the exception of the last sentence, the State Department letter supports Ouda's claims of persecution.[4] More importantly, Ouda's testimony, which has been credited with veracity, illustrates that the acknowledged abuse of

---

[4]Halmo further explained generally that the Kuwaiti government was following a policy of "Kuwaitization" of the labor force which the State Department did not view as synonymous with persecution. However, he also stated: "In the revalidation of the residence permits of the foreign population in Kuwait, the government distinctly has *not* favored the nationals of those countries which expressed support for the Iraqi cause in the war – Yemen, Sudan, Jordan, Libya and of course the stateless Palestinians because of the PLO's position on the war," and assessed that Ouda's chances of receiving the requisite approval to enter Kuwait were "quite slim." *Id.* He concluded:

As to the situation of Palestinians in Kuwait at this moment, we believe that there is a lingering resentment on the part of some Kuwaitis over the perceived role of the Palestinians during the war. But we have received no reports since about the end of 1991 that Palestinians are being routinely assaulted on the streets by vigilantes, publicly humiliated or being beaten in jail because they are Palestinians. Any foreigner, including any Palestinian, is subject to deportation if his or her residence permit is not renewed on an annual basis. There have been credible reports of Kuwaitis harassing Palestinians by detaining them for a few hours and then releasing them. It is our view that, in the main, the Palestinians who remain in Kuwait legally are settling into a reasonably stable existence free from the more egregious forms of human rights abuses.

---

Palestinians after the Gulf War did *not* end in December 1991 and casts doubt on the accuracy of the letter.[5]

As previously noted, an asylum applicant who satisfies the burden of establishing past persecution is presumed to have a well-founded fear of future persecution. *Mikhailevitch*, 146 F.3d at 389. Because the BIA incorrectly found that Ouda did not establish past persecution, it also erred in failing to give her the benefit of the presumption of well-founded fear of future persecution to which she was entitled. Instead, the BIA determined that it was Ouda who "had the burden of showing a 'reasonable possibility' of suffering persecution if returned to Kuwait," and concluded that she failed to do so. In so holding, the BIA relied on the State Department's opinion that "for the most part Palestinians in Kuwait who are there legally are settling into a relatively stable existence free from egregious human rights abuses." This analysis is inadequate to determine whether the State Department letter provides sufficiently detailed information to rebut the presumption of well-founded fear arising from Ouda's experiences in Kuwait.[6] *Begzatowski v. INS*, 278 F.3d 665, 671-72 (7th Cir. 2002).

The aforementioned errors require remand to the BIA in order to properly shift the burden to the INS of establishing by

---

[5]On the other hand, if the State Department letter accurately depicts a general change for the better, then it would support Ouda's claim that her family was targeted for persecution and would impact the well-founded fear of persecution analysis. *See, e.g., Gailius v. INS*, 147 F.3d 34, 36 (1st Cir. 1998) (generally improved country conditions do not render an applicant ineligible for asylum when, despite those changes, there is a specific danger to the applicant).

[6]In concluding that Ouda failed to carry her burden of establishing a well-founded fear of persecution, the BIA also mentioned the fact that two of Ouda's siblings remained in Kuwait "without any asserted harm." A review of the record shows only that Ouda testified that her older brother and sister were unable to leave Kuwait because they were unable to obtain visas, and that she has spoken to her sister only once since coming to America.

a preponderance of evidence that Ouda does *not* have a well-founded fear of persecution should she be returned to Kuwait. We note that the BIA's analysis must take into consideration the fact that Ouda was expelled from the country based on her father's perceived support of Iraq during the Gulf War.

Accordingly, the judgment of the BIA is **REVERSED** and the case is **REMANDED** for further proceedings consistent with this opinion.