File Name:  06a0189n.06
Filed:  March 20, 2006NOT RECOMMENDED FOR
FULL-TEXT PUBLICATION

Nos: 04-4457/05-3090

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

LUAN CELA, TIGER CELA,
        *Petitioners - Appellees*

                                                Petition for Review of an Order
                                                of the Board of Immigration Appeals

                v.

ALBERTO GONZALES,
ATTORNEY GENERAL OF THE UNITED STATES,
        *Respondent - Appellants*

_____/


        BEFORE:  KENNEDY,  MOORE and SUTTON, Circuit Judges.

        KENNEDY, Circuit Judge.

        Petitioners, Luan Cela and Tiger Cela, petition for review of the Board of Immigration

Appeal's denial of their applications for asylum under Section 208 of the Immigration and

Nationality Act, 8 U.S.C. §1159.  Petitioners argue that (1) substantial evidence compels this court

to find that the immigration judge and the Board of Immigration Appeals erred by finding that

Petitioners did not suffer past persecution or have a well-founded fear of future persecution "on

account of race, religion, nationality, membership in a particular social group, or political opinion"

8 U.S.C. §1101(a)(42)(A) (2001); (2) and, that the Attorney General's "streamlining" procedure

violates their due process rights.  For the following reasons, we **AFFIRM** the decisions of the Board

of Immigration Appeals, and we **DISMISS** their appeals.

# BACKGROUND

Petitioners, Luan Cela ("Luan") and Tiger Cela ("Tiger"), Luan's brother, are native citizens of Albania. Removal proceedings were commenced against Luan with the filing of a Notice to Appear ("NTA") with the immigration court on June 22, 1998. Removal proceedings commenced against Tiger on February 6, 2001, again with the filling of a NTA.

In both cases, the NTAs alleged that Petitioners are: (1) native citizens of Albania; (2) not citizens or nationals of the United States; (3) aliens who are ineligible for admission to the United States because they attempted to procure a visa or other entry document by fraud or misrepresentation; (4) aliens who do not possess any valid document entitling them to entry; and, (5) aliens lacking any means of financial support. The NTAs charged Petitioners as removable from the United States because they are immigrants: (1) lacking any documents entitling them entry; (2) who sought to procure a visa or admission document through fraud or willful misrepresentation of a material fact; and (3) likely to become public charges. J.A. at 516.

On November 10, 1999, Luan, through his attorney, admitted the factual allegations with respect to being an alien who arrived without entry documents. Luan conceded removability and submitted an application for asylum. On January 11, 2002, Tiger entered a plea admitting that he is removable because he lacked entry documents and he also submitted an application for asylum.

On August 26, 2003, the immigration judge ("IJ") conducted an evidentiary hearing on both Petitioners' applications for asylum. Because the facts on which their requests for asylum are based are similar, and in some instances identical, the IJ conducted a single hearing for both and issued one decision. However, their proceedings remained separate.

2

At the hearing, the IJ heard the testimony of Luan, Tiger, and Mr. Cela (Petitioners' father), and found the testimony of all three to be credible. First, Mr. Cela testified regarding his political opinion, his career as a police officer in Albania, and to several incidents related to his problems with the Socialist Party. He stated that he was born in Albania in 1955. He was a career police officer and, in 1988, when he was the police chief of Tropoja under the Communists, he met Azem Hajdari, the leader of the anti-Communist Albanian Democratic Party. Mr. Cela was inspired by the anti-Communist movements of Eastern Europe and, in January 1991, he became an active member of the Albanian Democratic Party. On March 22, 1992, he was elected as a deputy in the Albanian Parliament; however, he left this position after only about four months because he was appointed the police chief of Shkoder, his birthplace. As police chief Mr. Cela supervised 620-630 officers. The minister of public order asked Mr. Cela to replace some of the existing officers with Democratic Party loyalists. Mr. Cela refused, and because of his refusal he was fired and unable to find work for several years.

However, Mr. Cela eventually was able to find work again, even after 1997, the year the Socialists took control of the government: from January of 1998 until March of 1998 he was the chief of the anti-drug unit in Shkoder; from March 1998 until July of 1999 he was the chief of police in the commissariat of Shkoder; and, from September of 1999 until April of 2000, he was the chief of the anti-terror unit.

Mr. Cela testified regarding several incidents related to his problems with the Socialist Party. In January of 1994, he explained that there was a politically motivated killing in Shkoder and, to conceal this true motive for the crime, Mr. Cela's cousin, Selman Cela, was accused of committing the crime. Because of this, around 30 policemen searched Mr. Cela's home for about an hour. Mr.

3

Cela informed the press of this search. Subsequently, the minister of public safety summoned Mr. Cela to his office and tried, albeit unsuccessfully, to convince Mr. Cela to get his cousin to confess to the murder. The cousin was eventually charged, but never tried or convicted. However, for over a month, Mr. Cela's house was watched by agents and he was followed.

In December 1995, Mr. Cela stated that he wrote an article that was published in a local newspaper, speaking out against corruption. After it was published, his house was searched by policeman and his son, Luan, was hit by one of the policeman.

In early 1997, Mr. Cela testified that after he spoke on behalf of the Democratic Party, a Socialist Party leader told him that once the Socialists took control of the government, he would be "in trouble." Once the Socialist Party did come into power later that year, Mr. Cela was arrested and detained for two days.

Finally, he testified that on April 14, 2002, men who Mr. Cela claimed were "hit men" came to his house and terrorized his wife and mother. Mr. Cela left Albania after this last incident.

Petitioner's attorney asked Mr. Cela how he was able to maintain his job as a police officer after the Socialist Party took control of the government, in light of the fact that he opposed the Socialist Party. Mr. Cela explained that the Socialist Party had promised to co-govern with other parties and that they were not going to repeat the Democratic Party's mistakes of replacing everybody and, in addition, he was a public figure.

Luan testified next. He said he became a member of the Democratic Party of Albania in May 1996 through his school association. Notably, this is the only testimony that either brother provided indicating participation in a political organization. When Luan was asked if he had ever been threatened or beaten he responded in the affirmative, and went on to detail three different incidents.

4

First, he corroborated his father's testimony regarding a search of their house in December of 1995. Luan stated that while he was studying in his room he heard a noise on the first floor and so he opened his door to see what had happened. As soon as he opened the door, he encountered a policeman who pushed him out of the way. The policeman then searched the room, destroying it in the process. In his room, Luan had an American flag hanging on the wall and once the officer saw it, he hit Luan in the face and then berated him until Luan's mother finally physically interceded. Luan testified that the policeman said, "you are a real democrat just like your father." He tried to kick Luan but his mother covered him with her body.

Second, Luan testified that in November 1996, he was inside his classroom and two people with masks on came inside and took him away. They lifted him up, pulled out a knife and directed the knife underneath his left eye while shouting at him. They said that if his father did not stop his activities they would kill him and that this would not be the last time they would see each other. Luan's eye injury was treated by his aunt, a nurse, and he still has a scar because of the incident.

Finally, in February 1998, Luan stated that while his father was working as a police officer, he was returning home from school and two men pulled up to him in a minivan, covered his face, and drove him to an unfinished building. They then tied him to a chair and beat him. They told him that if his father did not stop his activities against Mr. Musaraj (the Albanian interior minister of public order who was a member of the Socialist Party and involved in illegal activities), they would kill him. After learning of his son's disappearance, Mr. Cela notified the local police and began a search. The kidnappers put Luan back in the minivan, drove off, and then threw him, tied up, onto the road. In his own words, they told him, "We are letting you [out] here and we are warning your father who must understand that we have the power to do everything and the government is ours, not yours." J.A.

5

at 383. Luan was discovered the next morning by people living nearby. The police brought him home about 18 hours after he was kidnapped. Mr. Cela, using his experience as a police officer, learned that the kidnappers were criminals hired by Mr. Musaraj. However, since he lacked evidence he never reported this officially. Luan has indicated that he believes if he goes back to Albania he will be murdered.

Tiger Cela testified last. When asked if he has ever been beaten, threatened or arrested he responded in the affirmative, citing an instance on December 3, 2000. He testified that he was bicycling to school on the sidewalk and he noticed a car approaching from behind. He recalled what happened to Luan in the past (referring to the December 1995 kidnapping incident) and started to pedal as hard as he could. He heard the car approaching, but fortunately, there was a group of school children walking to school and he joined them. When he looked back, he saw the car drive the other way.

In an oral decision from the bench, the IJ focused on whether the incidents relayed by the witnesses "happened to them on account of one of the five protected grounds, race, religion, nationality, membership in a particular social group or political opinion." J.A. at 49. The IJ found that "what happened to the respondents although unfortunate and somewhat deplorable, is not traceable to political opinion but is rather traceable to the general conditions that exist in Albania and specifically, to their father's position as an honest police officer who is attempting to combat that." J.A. at 49-50. The IJ denied both Luan's and Tiger's asylum applications.

Luan appealed to the Board of Immigration Appeals ("BIA") and the BIA issued a decision and opinion concurring with the immigration judge's findings. Tiger also appealed and the BIA affirmed the findings of the IJ, without an opinion. Each filed a petition for review with this court.

6

Since the evidentiary records for both the appellants are identical, and the IJ's basis for denying asylum the same, we consolidate Petitioners' appeals.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under section 242 of the Immigration and Nationality Act ("INA"). 8 U.S.C. § 1252 (2000). Whether an asylum applicant has demonstrated past persecution or a well founded fear of future persecution is a factual determination reviewed under the highly deferential substantial evidence standard. *Yu v. Ashcroft*, 364 F.3d 700, 702-703 (6th Cir. 2004); *Liti v. Gonzales,* 411 F.3d 631 (6th Cir. 2005). Under this deferential standard, "findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Yu*, 364 F.3d at 702 (quoting 8 U.S.C. § 1252(b)(4)(B)). "[T]he petitioner must show that the evidence presented was so compelling that no reasonable factfinder could fail to find the requisite persecution or fear of persecution." *Ouda v. INS,* 324 F.3d 445, 451 (6th Cir.2003).

## ANALYSIS

### I.

An alien who seeks asylum must establish that he or she is a "refugee" under the INA. 8 C.F.R. §1208.13(a). Section 1101(a)(42)(A) of the INA defines a refugee as an alien who is unable or unwilling to return to his home country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §1101(a)(42)(A) (2001). The burden falls on Petitioners to show that they meet this definition. 8 C.F.R .§ 1208.13(a).

### A. Tiger Cela

In Tiger's case, because the BIA affirmed the decision of the IJ without a separate opinion, we review the decision of the immigration judge directly. *Gilaj v. Gonzales*, 408 F.3d 275, 282-83 (6th Cir. 2005) (citing *Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003)).

The IJ found that "what happened to the respondents, although unfortunate and somewhat deplorable, is not traceable to political opinion but is rather traceable to the general conditions and the criminal conditions that exist in Albania and specifically to their father's position as an honest police officer who was attempting to combat that." J.A. at 49-50. The IJ went on to note that even though the "respondents' father was out of favor with elements of the Democratic Party he was nevertheless selected by the Democratic Party to be a police officer and was retained in that position by the Socialist Party," and that "[g]iven those facts...the court is unable to conclude that the difficulties that the witness had (and as a result perhaps his son had) were traceable to his political opinion." J.A. at 50. The court concluded those difficulties were more likely traceable to "their father's honesty as a police officer and his willingness to speak out against crime." J.A. at 50. Because the IJ denied asylum based on his finding that Tiger failed to establish the requisite nexus between any harm he experienced and one of the 1101(a)(42) grounds of the INA, (in his case, political opinion), the IJ did not make any finding regarding past persecution or a well-founded fear of future persecution.

Tiger argues that the IJ "improperly impose[d] a negative slant on the testimony provided which would have otherwise established Petitioner's claim of a well-founded fear of persecution." Tiger Br. at 37. We disagree and find that the evidence in this case supports the IJ's finding that there is not a sufficient nexus between any harm suffered by Tiger and his or his family's political views.

The record establishes that regardless of the political party in control, Mr. Cela continued to

8

work as a police officer. Thus, the IJ found that any difficulties Tiger and his family experienced in Albania were not traceable to Mr. Cela's - or Tiger's - political opinion, but rather to the fact that Mr. Cela was an "honest cop." This finding is supported by Mr. Cela's testimony at the hearing:

> Q. ...Sir, to speed things up here I'm going to try and tell everything that I see is going on here. And just tell me if this is a fair appraisal, what I see going on.
> A. Yes.
> Q. Basically, what I see is except for the three months you were [a parliamentary] deputy, you've basically been a police officer your whole life, haven't you?
> A. Yes.
> Q. And you've been an honest officer haven't you?
> A. Yes.
> Q. And you worked when the [C]ommunist[s] were in control from '85 to '92, you worked for the [C]ommunist[s] but you did it in a fair way as a police officer, is that correct?
> A. Yes.
> Q. And you're an honest police officer and you see things going on that appear to be dishonest like hiring police officers that shouldn't be hired and you tell people what you think, right?
> A. It was true it was against the [D]emocratic [P]arty program.
> Q. Okay. But because of that for the next four years basically you're unemployed, aren't you?
> A. Yes.
> Q. Okay. And then somewhere a couple of years in '94, it looks like you even get frustrated with the [D]emocratic [P]arty and so you join Bali (phonestic sp.) Kompetar (phonetic sp.), is that fair?
> A. Yes.

J.A. at 218-19. Mr. Cela went on to concede that he retained his position as a police officer even after the Socialist Party won the election in 1997 because they saw him as an "honest good cop that will help the government." Mr. Cela was also asked questions to clarify the motive of those who threatened him and his sons:

> Q. ...And because you're an honest cop is that the reason why they kidnaped your son [Luan]?
> A. This is one of the reasons.
> Q. Well, what's the other reason?
> A. And my political beliefs.

9

Q. But sir, I don't understand what your political beliefs are. I know you're anti-[C]ommunist but you work[ed] for the [C]ommunist[s]. I know you're a [D]emocratic [P]arty candidate but they basically throw you out of a job after six months because you criticize them. Then you become a nationalist (indiscernible) union member, correct?

A. Bali (phonetic sp.) Contar (phonetic sp.).

Q. Bali Contar, correct? So what I'm seeing here is I don't see how anybody sees your politics is because what I really see is you were once a Democratic Party, you were Bali Contar, and all I know is you hate the [C]ommunist[s] but you worked for them. And you hated the [S]ocialist[s] and you worked for them. So what are you[r] political beliefs in all of this?

A. I always worked for the right and for the law.

\*       \*       \*

Q. ...What I'm hearing is one common thing, (indiscernible) is that you are one honest cop, regardless of any political party in Albania. Is that fair to say?

A. Yes.

J.A. at 220-22. In light of this testimony, we find that the IJ drew a reasonable inference regarding the motive of Mr. Cela's persecutors when he found that any difficulties Mr. Cela and his family experienced were not "on account of" Mr. Cela's political opinion, but rather, on account of the fact that he was an honest police officer. Thus, Tiger has not identified any evidence or testimony that would compel a reasonable fact-finder to conclude that he was persecuted or that he possessed a well-founded fear of persecution "on account of" a political opinion that he or his father holds.

### B. Luan Cela

On December 20, 2004, the BIA issued a decision and a separate opinion dismissing Luan's appeal. Thus, the BIA's decision is the final agency determination and we review that decision on appeal.

The BIA concurred with the IJ's findings and concluded that "the harm the respondent suffered was not on account of his imputed political opinion." J. A. at 2. The BIA reasoned that any danger to Luan arose from his father's "employment as chief police officer rather than from any political opinion that may have been imputed to the respondent." *Id.* Additionally, the BIA noted

10

that, even if Luan was harmed because of his father's political opinion there is no evidence that his father's political beliefs were ever imputed to him. J.A. at 2.

As previously explained, Mr. Cela's testimony supports the IJ's and the BIA's finding that Mr. Cela and his family were targeted not "on account of" their political beliefs, but rather, on account of the fact that Mr. Cela was an honest police officer. Again, we reiterate that Mr. Cela retained his position as a police officer even when the Socialist Party gained control. Further, we also agree with the BIA's finding that there is no evidence suggesting that whatever political view Mr. Cela had, was imputed to Luan by those targeting the Cela family. Thus, we find that the evidence in the record clearly supports the BIA's finding.

## II.

Finally, both Luan and Tiger also argue that the BIA violated their due process rights by following the Attorney General's streamlining procedure. They argue that the use of the streamlining procedure denies asylum applicants a fair review of their appeals because it changes the standard of review, permits one-judge review of their appeals, and allows for summary-affirmance-without-opinion of the IJ's decision. We review claims of due process violations in administrative proceedings *de novo*. *Mikhailevitch v. I.N.S.*, 146 F.3d 384, 391 (6th Cir. 1998).

In *Denko v. I.N.S.*, we upheld the validity of the streamlining procedure and rejected the same arguments that each raise in their briefs. *Denko*, 351 F.3d 717. Accordingly, we find these arguments are without merit.

## CONCLUSION

Thus, for the foregoing reasons, we deny applicants' Luan Cela and Tiger Cela petitions for appeal.

11