**NOT RECOMMENDED FOR FULL TEXT PUBLICATION**
File Name: 07a0221n.06
Filed: March 28, 2007
No. 05-4247; 06-3385

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

BAYDAA GORGIS IMSAIAH,
    *Petitioner-Appellant*

        v.

ALBERTO R. GONZALES, ATTORNEY GENERAL,
    *Respondent-Appellee*

_____/

On Review from the Board of
Immigration Appeals

**BEFORE: KENNEDY, BATCHELDER, and CLAY Circuit Judges.**

**KENNEDY, Circuit Judge.** Baydaa Gorgis Imsaiah appeals a final order of deportation issued by the Board of Immigration Appeals. She contends on appeal that the decision by the Board was not based on substantial evidence and that the Board improperly denied her motion to reopen in light of changed country conditions. We **AFFIRM**.

## BACKGROUND

Baydaa Gorgis Imsaiah ("Imsaiah") is a single Catholic Chaldean woman who was born in Iraq in 1982 and is, to this day, an Iraqi citizen. On May 25, 2002, she came to the United States, via an eleven month stay in Jordan, as a non-immigrant fiancé of a US citizen with authorization to remain in the US until August 23, 2002. She remained past that date. On March 20, 2003, Imsaiah filed an application for asylum with the Department of Homeland Security ("DHS"). The application was referred to an Immigration Judge ("IJ") and Imsaiah was served with a Notice to Appear. She conceded removability under the Immigration and Nationality Act ("INA") § 237(a)(1)(B), 8 U.S.C.

§ 1227(a)(1)(B) (admitted non-immigrant remaining in the United States longer than permitted). JA at 332, 538.

At a hearing held in Detroit, Michigan on May 10, 2004, Imsaiah presented her own testimony, the testimony of her brother Saraa, her sister Laymaa, and various documents and papers. Imsaiah testified that she had been harassed by Muslim students when she was a young child because of her Christian beliefs. When she would attend church, Muslim "radicals" stoned her and her siblings and made improper advances.

In addition, Imsaiah testified that she, along with her father, two brothers, and sister, were involved in the activities of the Kurdish Democratic Party ("KDP"). When she was young, she would collect donations for the KDP from sympathizers in her town; other members of her family were more involved. She testified that her family suffered as a result of their activities in the party. Her father, brothers, and sisters were, at various times, arrested, threatened, tortured, and imprisoned because of their involvement with the KDP. In 1997, for example, Iraqi security police arrested her father and two of her brothers in front of the rest of the family. During the arrest, her mother was questioned and struck with the butt of a gun. Her father and brothers were detained for one month, during which they were tortured, and were then released. Later in that year, one of her brothers was again arrested and detained. After that second incident, the two brothers fled to Turkey, and from there one traveled to the United States. JA at 10-11. Several of her family members have been granted asylum in the United States.

Imsaiah also testified to one incident where she herself was maltreated because of her political activities. On June 16, 2000, she accompanied her father to a nearby village to deliver papers to a KDP official. Her father became ill and asked her to take the papers herself while he

2

rested. On her way, she saw several Iraqi soldiers and hid in a nearby store. She testified that she did not realize that the owners of the store were Muslim but that when they saw her hiding, they contacted the Iraqi soldiers. The guards interrogated her and began to touch her inappropriately. In doing so, one of the guards noticed the papers under her shirt and ripped the shirt open. Upon finding the papers, they demanded to know how she had come by them and where she was taking them. After several minutes of this interrogation, Imsaiah stated that she had been given the papers by a person on the street who asked that she deliver them to a specific address. After the soldiers left, she hurried back to her father, and the two traveled to the KDP leader's house to tell him about the incident. On the way back to their home, her father told her not to say anything about the incident to her other family members. Her sister, however, testified that she had known of Imsaiah's incident before Imsaiah even returned home; Imsaiah testified that she did not tell her sister until the following November.

After the incident, on November 5, 2000, her sister and father were again arrested for their activities with the KDP. Her sister was interrogated, tortured, and raped while she was detained. She was released approximately a week later. Her father was released after approximately a month. He had been beaten and tortured while in prison and was in very poor condition.

In June of 2001, Imsaiah's family, through bribes paid by one of their connections in the KDP, were smuggled out of Iraq into Jordan. While in Jordan, Imsaiah became engaged to an American citizen who had seen her on a video. She received her K-1 visa and left Jordan on May 25, 2002 and traveled to Detroit, Michigan, arriving the same day. After several weeks in the United States, her fiance's father broke off the engagement. As noted above, she then overstayed her K-1 authorization and the DHS initiated removal proceedings against her.

3

On May 10, 2004, the IJ found that Imsaiah was removable, denied her application for asylum and withholding of removal, and ordered her deported because, *inter alia*, she was not credible and, regardless, country conditions in Iraq had changed after the United States led invasion deposed the former government. JA at 72. On September 8, 2005, the Board of Immigration Appeals ("BIA") affirmed the IJ's adverse credibility and change of country conditions determinations. JA at 22. On October 7, 2005, Imsaiah appealed that decision to our court. No. 05-4247 (6th Cir.).

On October 4, 2005, Imsaiah filed a motion with the BIA to reconsider its decision under 8 C.F.R. 1003.2(b). The BIA, apparently *sua sponte*, converted this motion to a motion to reopen under 8 C.F.R. 1003.2(c) because Imsaiah attached new reports and additional decisions from the BIA supporting her claim that country conditions had changed. On November 14, 2005, the BIA denied this motion. JA at 17. That decision was not appealed. However, on November 29, 2005, Imsaiah filed a motion to reopen under 8 C.F.R. 1003.2(c). Because the evidence submitted did not differ materially from that submitted with the previous motion to reconsider, the BIA denied the motion as number barred on February 16, 2006. JA at 13. Imsaiah appealed this second decision on the same day. No. 06-3385 (6th Cir.).

These appeals have been consolidated and are now both before us.

## ANALYSIS

### I. Standard and Scope of Review

We review factual determinations, including determinations of credibility and changed country conditions, for lack of substantial evidence. *Sylla v. INS*, 388 F.3d 924, 925 (6th Cir. 2004). This standard is "highly deferential," *Yu v. Ashcroft*, 364 F.3d 700, 703 (6th Cir. 2004), such that an

4

IJ's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). As always, however, we review conclusions of law, however, *de novo*.

When a single member of the BIA affirms the IJ in a brief order under § 1003.1(e)(5), we review both the BIA decision and the IJ decision as the final determination to the extent that they are not inconsistent. *Abebe v. Gonzales*, 432 F.3d 1037, 1040-41 (9th Cir. 2005) (en banc); *Uanreroro v. Gonzales*, 443 F.3d 1197, 1202-04 (10th Cir. 2006); *Chen v. BIA*, 435 F.3d 141, 144 (2nd Cir. 2006); *see Gishta v. Gonzales*, 404 F.3d 972 (6th Cir. 2005).

## II. Statutory Framework

Imsaiah is eligible for asylum if she is a refugee, i.e. if she cannot return to Iraq "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A); *see also* 8 C.F.R. 208.13(b). Persecution is not defined by the relevant immigration statutes, but this court has previously found that it must be something "more than a few isolated incidents of verbal harassment or intimidation, unaccompanied by any physical punishment, infliction of harm, or significant deprivation of liberty." *Mikhailevitch v. INS*, 146 F.3d 384, 390 (6th Cir. 1998). We have also held, however, that "[t]here is no case law that requires [an asylum seeker] to show that she was personally detained, interrogated, beaten up or tortured in order to establish a claim of past persecution. 'Persistent death threats and assaults on one's life, family, and business rise to the level of persecution within the meaning of the [INA].'" *Ouda v. INS*, 324 F.3d 445, 454 (6th Cir. 2003) (quoting *Andriasian v. INS*, 180 F.3d 1033, 1042 (9th Cir. 1999)).

5

If an applicant for asylum provides proof of past persecution, a rebuttable presumption of refugee status attaches. *Ouda,* 324 F.3d at 451; 8 C.F.R. 208.13(b)(1). However, that does not imply that an applicant must have suffered past persecution to demonstrate a "well-founded fear." Rather, the "[f]ear of persecution must be both subjectively genuine and objectively reasonable." *Lumaj v. Gonzales*, 462 F.3d 574, 579 (6th Cir. 2006) (citing *Perkovic v. INS*, 33 F.3d 615, 620-21 (6th Cir. 1994)). The applicant must only believe that persecution is likely to occur upon her return and we must agree that such a belief is reasonable.

If the applicant provides proof of past persecution, the government can rebut the presumption with evidence that conditions in the applicant's country have changed such that the fear of persecution could no longer reasonably exist for the applicant herself*, Ouda*, 324 F.3d at 452; 8 C.F.R. 208.13(b)(1)(i)(A), or that the applicant could live without persecution or fear of persecution in a different part of their country. 8 C.F.R. 208.13(b)(1)(i)(B).

### III. Discussion

The IJ found that "the government has certainly established a change in conditions since the time [Imsaiah] departed" and that these changes any well-founded fear of persecution that Imsaiah might have had. Reviewing the country reports and other evidence in the record, this finding is supported by substantial evidence. This court has consistently found that the fall of the Hussein government rebuts any well-founded fear based on persecution that occurred under that regime. *See, e.g., Aoraha v. Gonzales*, Nos. 05-4270 & 05-4272, 2006 App. LEXIS 31732, at *7 (6th Cir. 2006) (unpublished); *Al-Shabee v. Gonzales*, 188 F. App'x 333, 338 (6th Cir. 2006) (unpublished); *Toma v. Gonzales*, No. 04-4310, 179 F. App'x 320, 323-24 (6th Cir. 2006) (unpublished); *Khora v. Gonzales*, No. 04-4182, 172 F. App'x 634, 638 (6th Cir. 2006) (unpublished).

6

Because the government has overcome any presumption that might have attached by showing changed conditions, we decline to address the alleged instances of past persecution.

**CONCLUSION**

For the above reasons, the final order of the BIA is **AFFIRMED**.