*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 07a0220p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

YIDONG BU,

*Petitioner,*

*v.*

No. 05-4663

ALBERTO GONZALES, Attorney General,

*Respondent.*

On Petition for Review of an Order
of the Board of Immigration Appeals.
No. A95 309 928.

Argued: April 17, 2007

Decided and Filed: June 15, 2007

Before: MARTIN and DAUGHTREY, Circuit Judges; SCHWARZER, District Judge.[*]

---

### COUNSEL

**ARGUED:** E. Dennis Muchnicki, Dublin, Ohio, for Petitioner. Robert C. Bartlemay, Sr., UNITED STATES ATTORNEY, Dayton, Ohio, for Respondent. **ON BRIEF:** E. Dennis Muchnicki, Dublin, Ohio, for Petitioner. Laura I. Clemmens, UNITED STATES ATTORNEY, Dayton, Ohio, for Respondent.

---

### OPINION

---

MARTHA CRAIG DAUGHTREY, Circuit Judge. In this asylum case, petitioner Yidong Bu challenges the decision of the Board of Immigration Appeals (BIA) summarily affirming the immigration judge's denial of Bu's asylum application. Because we conclude that the immigration judge misapprehended the nature of Bu's claim that he had suffered past persecution in his native China based on political opinion, and because substantial evidence fails to support the denial of asylum, we find it necessary to remand the case to the immigration court for reconsideration.

---

[*]The Honorable William W Schwarzer, United States District Judge for the Northern District of California, sitting by designation.

## I. *FACTUAL BACKGROUND*

The facts in Bu's case were not disputed, and the immigration judge found him to be fully credible. According to Bu, prior to fleeing China he had served as the elected chairman of the labor union at a state-owned optical equipment factory. As union chairman, Bu represented over 1800 workers and oversaw the provision of food, clothing, and housing for all of them. He also "negotiate[d] with the head of the factory" for these workers' salaries and retirement insurance. Bu testified that the factory had "a history of . . . corruption and bribery" and that the problem became markedly worse when, in 1997, the government appointed a new factory director. Under the new director, Bu stated, "[t]he management of the factory was in a mess and corruption by factory officials became more and more severe." The workers that Bu represented took the brunt of this corruption. As Bu detailed in his asylum application:

> The new factory director sold production equipment at good conditions to his relatives at the prices of discarded equipment. Then, he purchased new equipment at high prices to make a profit for himself. He also rented the factory office building facing the road to his son at very low rent so that his son could open a computer company. His relatives and friends worked in the Supply Department and Financial Department of the factory. Raw materials were purchased at high prices and quality was poor. The cost of our products skyrocketed and lost market competitiveness. The factory officials drove luxury cars and lived in luxury houses. On the other hand, the workers' wages/salaries, medical expenses and pensions were all past due. The workers were angry, but didn't dare to say anything. The factory was depleted slowly and operated at a loss.

At his asylum hearing, Bu added that "[f]rom the head of the factory and down to some department heads or leaders in the units, they were all putting monies into their own pocket and ignoring the benefit of these old workers." As a result of this official corruption, the workers lost both their wages and their retirement insurance.

According to Bu, by 2001 "[t]he state policy to 'close down, merge and to reorganize businesses running at losses' gave the factory officials an other [*sic*] chance to make a fortune for themselves." This policy enabled the head of Bu's factory to attempt the sale of the state-owned enterprise to a private party. "[O]n the verge of bankruptcy," Bu said, "the factory officials decided to sell the factory" at a very low price, and a prospective buyer bribed the factory officials to reach an agreement to sell. But the buyer wanted only the factory and not the factory workers – especially, Bu said, not those in "poor health conditions or over 40 years old." In an effort to forestall sale of the factory, the workers pleaded with the factory director, who "turned a deaf ear to the[ir] requests." As a result, "about 1,800 workers in the factory, led by [Bu], staged a sit-in strike in front of the factory director's office building on or about March 8, 2001 . . . protesting the factory officials' corrupt acts of putting monies into their own pockets at the expense of factory workers' benefits and livelihood."

The protest was peaceful but at the end of the day, as Bu left the strike and headed home, he was followed by two police officers who stopped him and ordered him to accompany them to the police department. There, they put him in an "interrogation room," where they questioned him about his involvement in the strike. Bu admitted to the officers that he had organized the strike. They informed him that he had been "reported for gathering a crowd to make trouble and disturbing social stability," but that if he could "dissuade the workers from having another strike" they would cease investigating him. When Bu declined to cooperate, the police refused to release him.

According to Bu, he was then "intentionally put into a cell with other criminal inmates who cruelly beat him up at the instruction of the policemen." Bu was taken to a cell occupied by eight

"common criminals." An officer placed Bu in the cell and then told the other occupants that Bu had "lost his mind" and instructed them to "help him out." The officer then "stepped out to smoke" and "[t]he prisoners in the cell started to beat [Bu] cruelly." Bu explained: "They hit me and kicked me. I had nowhere to hide. I screamed and passed out." Bu stated that he was "beaten up hard" and that his "mouth and nose were bleeding," but the "police ignored [him]."

Bu was detained for a total of seven days, during which he was "beaten up severely by inmates everyday." He elaborated:

> Sometimes when I was sleeping, the other inmates hit me hard with a sheet of quilt covered me. It could last for over twenty minutes. Sometimes they had someone seize my legs and arms, and someone sit on my back jolting. It was very painful. I could even hear the cluck sound on my back. When we had meals, they always robbed my food. When I was sleeping, they placed the toilet beside my head and did not allow me to move it. The smell of the toilet was so disgusting that I almost thrown up. They spattered the urine to me on purpose when they urinated. I reported to the police but I was told to forbear it. They said that I would never get a good result if I went against the government.

Bu's family was finally able to bail him out of jail, but for a sum far in excess of the annual income for an urban worker. The police department's "decision notice on bailing out and awaiting for trial" stated that Bu had "organized illegal meeting, gathered workers to disturb the public security, stroke [*sic*] and harassed the social order." When he was released, the police again "told [Bu] to dissuade the workers from having another strike" or he "would have to spend the rest of [his] life in jail." He was also advised that his "case was not over yet" and "told not to go against the government." As a condition of his release, Bu was required to report to the police regularly and was subject to surveillance.

After Bu was released, his wife took him to the hospital because he had "bruise[s] everywhere." According to hospital records, Bu entered the hospital on the day of his release complaining that he had a "[s]urgical injury on face and head with headache for one week," that he "was hit on head and face in a week," and that "[a]fter being beaten, patient felt headache, dizziness and sickness, and thrown up several times." The hospital records describe "a 5.5 cm hematoma on head, painful when touched; left face swelled; 4.6 cm wound, painful when touched; chest and back has several blood clot; left eyelid swelled, conjunctiva become bloodshot."

Meanwhile, the director of the factory had lodged charges against Bu, discharging him and accusing him of "abus[ing] [his] official powers, incit[ing] crowd to harassed [*sic*] public security and strike, which affected the production, violated the social order and caused a serious result." While Bu was in the hospital, policemen "constantly . . . came to [his] house to inquire about [him]." Bu testified that as a result of his treatment in jail, he "was so afraid, [he] just stayed home and . . . didn't get in touch with anybody" in an effort to avoid being re-arrested. After a week, he escaped to an aunt's house in Beijing, where he "didn't dare to go out" and "just stay[ed] in" until he was able to secure the means to leave the country. Since his arrival in the United States, his wife has reported that police have come to his house in China searching for him and indicating that he was "guiltier" because he had "escaped during [his] time of release on bail." Bu's wife has also received many threatening phone calls. In addition, Bu learned that, after he left China, some of his co-workers had gone to the city government and reported that the head of the factory had "sold the equipment, the facilities, and put money into his own pocket" and that, as a result, they had been incarcerated for "accusing the head of the factory of being corrupt."

What occurred at Bu's workplace was consistent with the 2002 U.S. Department of State Country Report on Human Rights Practices for China, which notes that China was "transition[ing]

from a centrally planned to a market-based economy" by "privatiz[ing] many small and medium state-owned enterprises (SOEs) and allow[ing] private entrepreneurs increasing scope for economic activity." The "massive restructuring of state-owned enterprises" impacted "tens of millions of" workers, causing job losses, lost wages and benefits, and delayed wages and benefits. The Country Report also reveals that official corruption was a major problem in China at the time of Bu's encounter with the local police, "as demonstrated by the prosecution and sentencing of roughly 18,000 officials on corruption-related charges in 2000," and identifies "managerial corruption" as one of the specific problems protested at labor demonstrations. The Country Report further notes that in response to such protests, "[p]ersons critical of official corruption or malfeasance . . . frequently were threatened, detained, or imprisoned," citing as an example a journalist imprisoned for "'subverting state power'" by "writ[ing] a series of articles exposing official corruption." According to the Country Report, large worker protests occurred, based on allegations "that managers and local government officials had stolen funds earmarked for plant modernization and pension plans," and the leaders of some of these protests were detained without being charged. Specifically, it describes a protest against "unpaid wages, layoffs, and alleged corruption" that resulted in the arrests of four protest leaders.

In China, according to the Country Report, "[n]either the Constitution nor the law provides for the right to strike," and the government treated worker protests as illegal. But labor activists were not merely prosecuted for breach of China's anti-strike provisions. Instead, many were detained for "'counterrevolutionary' offenses." In addition, "[w]orker activists" were "found guilty of subversion" and "'incitement to subvert state power'" and, according to "credible reports," "trade union dissidents" were committed to government-run "high-security psychiatric hospitals for the criminally insane," alongside religious dissidents and "persons who petitioned the Government for redress of grievances." In listing specific political prisoners, the Country Report includes labor activists and a journalist who had "disclos[ed] news of labor demonstrations to Radio Free Asia." The Country Report also explains that although "[t]he Prison Law forbids prison guards from . . . beating or encouraging others to beat prisoners," "[r]eleased [political] prisoners reported that common criminals have beaten political prisoners at the instigation of guards."

## II. *ASYLUM PROCEEDINGS*

Bu filed a timely asylum application with INS in which he stated that he had "been persecuted by the Chinese government for organizing and participating in the workers' strike in his factory" and "was forced to escape to the U.S.A." Bu also expressed his "reasonabl[e] belie[f] that" if he returned to China he would "be arrested and be subjected to further persecution" based on outstanding warrants there. Following an evidentiary hearing, the immigration judge nevertheless rejected Bu's asylum application, found him ineligible for withholding, and granted him voluntary departure. Although the immigration judge noted Bu's contention that the Chinese government had imputed a political opinion to him and persecuted him on that basis, the judge concluded that Bu had failed to articulate a "political opinion" during his testimony.

In reaching this conclusion, the immigration judge had analogized Bu's situation to that of individuals fired by new factory owners in the Rust Belt of the United States and asked Bu, "[I]f he owns the factory, why can't he do that?" In explaining why he did not believe that Bu was detained and beaten up on the basis of political expression, the judge asserted that Bu was "in the same situation as other workers in China who lost their jobs when the government sold the plants and moved out of the business of operating these economic enterprises." Bu attempted to clarify the judge's misconception about the timing of the workers' protest that Bu led, which apparently occurred in an effort to *prevent* the sale of the factory, and that his arrest was based on "opposition to the government," not merely a protest over the loss of his employment. The immigration judge nevertheless held that Bu was not persecuted for a perceived political opinion but "rather that respondent was roughed up and jailed for violating a law of general application and not on account

of one of the five protected grounds." The Board of Immigration Appeals summarily affirmed the denial immigration judge's denial of relief.

### III.  *ANALYSIS*

An immigration judge "has discretion to grant asylum to any alien who qualifies as a refugee." *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004) (citing 8 U.S.C. § 1158(a), (b)) (footnote omitted). Accordingly, "fielding a request for asylum 'involves a two-step inquiry: (1) whether the applicant qualifies as a "refugee" . . . , and (2) whether the applicant merits a favorable exercise of discretion.'" *Id.* (quoting *Ouda v. INS*, 324 F.3d 445, 451 (6th Cir. 2003)). "Refugee" is defined as:

> any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1101(a)(42)(A). "[W]e review the [immigration judge]'s factual determination as to whether the alien qualifies as a refugee under a substantial evidence test." *Yu*, 364 F.3d at 702. Specifically, the immigration judge's "findings of fact are 'conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" *Id.* at 702 (quoting 8 U.S.C. § 1252(b)(4)(B)). "Regarding the second step, the discretionary judgment to grant asylum to a refugee is 'conclusive unless manifestly contrary to the law and an abuse of discretion.'" *Id.* at 703 (quoting 8 U.S.C. § 1252(b)(4)(D)).

Even giving the immigration judge's determination the appropriate deference, we conclude that the decision in this case is not supported by substantial evidence in the record. It is clear from Bu's accredited testimony, corroborated by the hospital documents and dovetailing with the State Department's 2002 Country Report on China, that Bu was persecuted not merely as a striker protesting his potential loss of employment, but as a political activist attempting to expose corruption by government officials and to protect the workers' interests. The evidence is thus compelling that Bu was detained not as a "common criminal" for violating China's anti-strike laws, but as a political prisoner who was guilty of opposition to the government. Bu not only organized the protest but refused to accede to the order by police to forestall further protests.

It is well-recognized that "[i]n order to demonstrate that an applicant has been persecuted on account of a political opinion . . . , it is not enough to present evidence that the applicant *had* a political opinion . . . . Evidence must be presented which suggests that the applicant was persecuted *on account of* or *because of* the political opinion." *Marku v. Ashcroft*, 380 F.3d 982, 986 (6th Cir. 2004) (citing 8 U.S.C. § 1101(a)(42)(A)) (additional citations omitted). Thus, a petitioner must show that "she acted based on a political opinion" and that her actions were "interpreted . . . as such" by her alleged persecutors. *Id.* at 987. A petitioner "is not expected to provide direct proof of [her alleged persecutor's] motive, but must show '*some* evidence of it, direct or circumstantial.'" *Id.* (quoting *INS v. Elias-Zacarias*, 502 U.S. 478, 483 (1992)).

Reviewing the immigration judge's ruling against that standard, we conclude that the record clearly refutes his determination that Bu failed to articulate a political opinion as the cause of his persecution by the government. Bu presented credible evidence that he acted upon his political opinion about government corruption and that his detention and abuse  were motivated by this activity. He further testified that after he had fled, a group of co-workers who had participated in the demonstration with him had been jailed for reporting to the local government that the head of

the factory was corrupt. Moreover, Bu was not merely detained for engaging in a protest, nor was he merely "roughed up." During the week he was jailed, he was beaten up so severely that it caused him to vomit and eventually to pass out, he was hit in the head and face to the point of bleeding, and he was periodically spattered with urine. When released, Bu was hospitalized and found to be covered in bruises, his face was swollen, and he was suffering from blood clots on his head, chest, and back.

None of this evidence was challenged at the hearing, nor has it been challenged by the government on appeal. Indeed, the government conceded at oral argument in this court that, on the merits, the case should be remanded to the immigration court for further consideration of the Country Report for the time period in question. At the same time, however, the government insists that the appeal must be dismissed because the petitioner has abandoned the claim that would permit him to prevail on the merits, in favor of a "substantively different" claim not raised below and, therefore, new and unexhausted. Thus, the government contends, "at no point in his hearing or in his appeal to the BIA did Bu argue that he believed [his] actions could be construed by the Chinese government as anti-government or subversive," and "there is no mention of Bu's opposition to the 'economic policy of the Chinese government to pursue a market economy'" in Bu's BIA appeal.

The petitioner responds that his argument on appeal is no more than a refinement of his long-standing contention that "[he] was persecuted by the Chinese government for a political opinion adverse to the Chinese government which the Chinese government imputed to him." We agree. To the extent the petitioner now argues that his challenge was to the implementation of "the Chinese government's economic policy choice to embrace a capitalistic market driven economy rather than a communist government direct economy," we read this theory as merely a response to the immigration judge's characterization of the situation in which Bu undertook the activity he did. We are not persuaded that he should be deprived of the opportunity to have a full review of his case, based on a matter of semantics rather than substance.

In this case, the factual predicate for the petitioner's asylum request is clear and uncontroverted. There is also no question that Bu has exhausted his claim that his protest of government corruption caused the persecution that he suffered.[1] Moreover, case law supports Bu's argument. The courts have held that whistleblowing against corrupt government officials may constitute political activity sufficient to form the basis of persecution "on account of political opinion," as can the refusal to accede to government corruption. *See, e.g., Grava v. INS*, 205 F.3d 1177, 1181 (9th Cir. 2000) ( "whistleblowing against one's supervisors at work is not, as a matter of law, always an exercise of political opinion[,] . . . [but] where the whistle blows against corrupt government officials, it may constitute political activity sufficient to form the basis of persecution on account political opinion" (citations omitted)); *see also Reyes-Guerrero v. INS*, 192 F.3d 1241, 1246 (9th Cir. 1999) (Colombian attorney who prosecuted corruption by members of the opposition party established "a causal connection between the persecution suffered by [him] and his political

---

[1] Although Bu's appellate brief focuses on his "new" argument that he protested Chinese economic policy, he also addresses his protest of government corruption. Bu undeniably argued to both the immigration judge and the BIA that he was persecuted because he had protested government corruption. He contended before the immigration judge that he had been persecuted on the basis of imputed or overt political opinion as expressed through his challenge to corruption. He then presented the issue to BIA in terms of "[w]hether the IJ erred in not finding [him] persecuted on account of political opinion, or at least an imputed one, even though [he] articulated his opinion against governmental managerial corruption and presented evidence on being persecuted for such acts." He also contended in his brief to BIA that "[t]he IJ's finding of no articulated political opinion is contrary to the fact[s] in the case and is also in direct contradiction to case law in that refusal to accede to government corruption can constitute a political opinion for purpose of an asylum applicant's refugee status." This claim is preserved in his appeal to this court. In his appellate brief, Bu contends that he "saw his struggle against his employers as a form of protest against the result of government action." He also questions "whether having other prisoners beat Petitioner until he passed out is a legitimate method of enforcing 'laws of general application'" and describes his abuse as an effort to "suppress unwanted political dissent."

opinion"); *Marquez v. INS*, 105 F.3d 374, 381 (7th Cir. 1997) ("political agitation against state corruption" can provide a basis for grant of asylum); *Desir v. Ilchert*, 840 F.2d 723, 727 (9th Cir. 1988) (Haitian citizen who resisted extortion by the government's semi-official security guards, the Ton Ton Macoutes, effectively "challenge[d] the underpinnings of the political system" and "bec[a]me an enemy of the government" despite his lack of overt expression of opinion).

Taken as a whole, the record in this case fails to provide substantial evidence to support the immigration judge's conclusion that Bu's detention and abuse were not based on the political opinion he expressed through his protest against corruption on the part of factory officials. The relevant Country Report makes very clear that the Chinese government deems criticism of government corruption to be political expression, indicating that "[p]ersons critical of official corruption or malfeasance . . . were frequently threatened, detained, or imprisoned." The report also indicates that some who spoke out against government corruption were detained without charges, while others were charged with "subverting state power." Moreover, Bu's treatment while incarcerated was consistent with the government's treatment of political prisoners as described in the Country Report, including the fact that political prisoners were seriously abused by other prisoners at the instigation of prison guards.

Given this information from the State Department, the government concedes that "[t]here is some evidence on the record, though not fully developed, that Bu and his colleagues were subjected to persecution because he and his union posed a political threat to government authority (evidenced by his co-workers arrest and detention after writing a letter to the Mayor of the city protesting the corruption at the factory)." The government also acknowledges that "[t]he record in Bu's case shows that the [immigration judge failed to make] any inquiry as to the possible political motivation of Bu's persecutors" and suggests that "[a]dditional inquiry" be made into the motives of Bu's persecutors. We agree.

## IV.  *CONCLUSION*

For the reasons set out above, we REMAND this case to the immigration court for further proceedings.