**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 08a0033n.06
Filed: January 9, 2008

**06-4297**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| SERGIO MILOVAN SANCHEZ, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | ON PETITION FOR REVIEW |
| | ) | FROM THE BOARD OF |
| MICHAEL MUKASEY, United States | ) | IMMIGRATION APPEALS |
| Attorney General, | ) | |
| | ) | |
| Respondent. | ) | |

Before: RYAN and DAUGHTREY, Circuit Judges; COHN,[*] District Judge

PER CURIAM. Petitioner Sergio Milovan Sanchez seeks review of the decision of the Board of Immigration Appeals affirming the immigration judge's order that denied his application for asylum, withholding of removal, and relief under the U.N. Convention Against Torture. For the reasons set out below, we conclude that Sanchez has failed to establish that he is a refugee for purposes of the immigration statutes, and we therefore deny review.

Sanchez, a citizen of Honduras, entered the United States in August 2000 and filed a timely application for asylum in March 2001. After several continuances, a hearing was

---

[*]The Hon. Avern Cohn, United States District Judge for the Eastern District of Michigan, sitting by designation.

finally held in April 2005, at which time Sanchez and his sister, Sandra Burgos, testified that in 1991 their father, Jose Saul Ramos, who was a member of the Nationalist Party and mayor of the village of San Rafael de Lempira, was killed by Antonio and Alberto Alvarado, two brothers who were also members of the Nationalist Party and residents of San Rafael de Lempira. Sanchez and Burgos testified that the Alvarado brothers killed their father out of jealousy because he had power and money and tried to help the poor. There was some indication that the Alvarado brothers were political rivals of Sanchez's father, but they did not hold political office, either before or after his father's death. The Alvarados allegedly did, however, gain power and money after the death, although the basis for their good fortune is not clear from the record. According to Sanchez, Antonio and Alberto each served one year in prison for the murder. Burgos testified that after the Alvarado brothers got out of prison, they threatened various members of her family and at one point poisoned fish in some family-owned fisheries. Due to these threats, Burgos's and Sanchez's mother moved to another city in Honduras, Santa Rosa de Copan in 1994, and as of the date of the hearing over ten years later, she remained there without incident. According to Sanchez, his other sister, Lesbie, fled Honduras in 1994 because of the Alvarados' threats and was eventually granted asylum in the United States. Although Sanchez's lawyer had asked Lesbie to attend Sanchez's hearing, she failed to appear and, therefore, did not corroborate any of her siblings' testimony.

Sanchez explained that at the time his father was killed and during the period when his family was being threatened, he was a young child living with his grandfather in San

Rafael de Lempira and, therefore, was not directly imperiled by the Alvarado brothers. But, he testified, once he reached high school, they attacked him outside the school building in November 1999 and beat him up, supposedly saying that because they had sons in school with Sanchez, they were afraid that Sanchez, as his father's only son, would try to avenge his father's death by killing their sons. The petitioner apparently received some sort of medical attention as a result of this incident, but it does not appear that he was hospitalized, and he did not testify that his injuries were extensive or severe. Nor did he report these events to the police, purportedly because the Alvarados were "powerful."

Despite the fact that Sanchez said that he feared for his life following the attack and would not have been safe anywhere in Honduras, he remained in San Rafael de Lempira for another seven or eight months, leaving the country in July 2000 with help from a church in Santa Rosa de Copan, where his mother was residing. He claimed that his mother has been safe thus far because she is a woman but, that as his father's only son, he would not likewise be protected from the Alvarados. Sanchez introduced his birth certificate into evidence, but it did not list his father's name, and there was no other documentation presented to corroborate his testimony or that of his sister.

The immigration judge denied relief on several independent grounds, first finding that Sanchez was not completely credible. Significantly, the judge held that, even if his testimony were credited, the events Sanchez described did not constitute persecution on account of a political opinion, both because the incident was isolated and not severe, and

because the petitioner failed to show a nexus between the incident and his actual or imputed political opinion. Finally, the judge found that Sanchez had failed to show that he could not safely reside in any part of Honduras, most notably Santa Rosa de Copan, where his mother safely resided. The BIA affirmed without an opinion.

Where, as here, the BIA summarily affirms the decision of the immigration judge "we review the immigration judge's decision as the final agency decision." *Sarr v. Gonzales*, 485 F.3d 354, 359 (6th Cir. 2007) (internal quotation marks, alteration and citation omitted); 8 C.F.R. § 1003.1(e)(4). Moreover, the immigration judge's "factual determination as to whether the alien qualifies as a refugee [is reviewed] under a substantial evidence test." *Bu v. Gonzales*, 490 F.3d 424, 429 (6th Cir. 2007) (internal quotation marks and citation omitted)). "Specifically, the immigration judge's findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Id.* (internal quotation marks and citation omitted).

To qualify for asylum, an alien must establish that he is a "refugee," which is defined, in pertinent part, as "any person who is outside any country of such person's nationality. . . and who is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42). In this case, it is clear beyond any doubt that the petitioner failed to establish that the beating

he suffered in November 1999 constituted "persecution" or that it occurred on account of the petitioner's "political opinion."

As to the petitioner's claim of persecution, we have repeatedly noted that although the term is not statutorily defined, it "must rise above the level of harassment or discrimination without physical punishment, infliction of harm, or significant deprivation of liberty." *Mohammed v. Keisler*, 507 F.3d 369, (6th Cir. 2007). Moreover, "[s]ome courts have held a single incident to be sufficient to demonstrate persecution, but it must be correspondingly severe . . . [and] the context must indicate that the asylum applicant is targeted for abuse based on his membership in a protected category." *Id.* (citations omitted). Here, the single physical attack suffered by the petitioner appears to have resulted in relatively minor injuries at most, followed by seven months without incident. Even if the incident could be said to be sufficient to support a finding of past persecution, it certainly does not compel the contrary conclusion. And, even if we were to find that the Alvarado brothers' history of harassment toward Sanchez's family also has relevance in the calculus, the time lapse between the alleged harassment and the incident that spurred Sanchez to flee Honduras is telling. The last incidents of harassment against the petitioner's relatives purportedly occurred in 1994, five years before the November 1999 beating and, as noted above, there were no incidents of harassment toward Sanchez or any other member of his family in the seven months before his departure. Nor was there any testimony that the family was harassed at any time after Sanchez's departure, even though members of Sanchez's extended family, including some of his uncles, apparently

still live in the area.  Given this time line, the record does not compel us to conclude that the beating was anything other than an isolated incident.

But even if we were to find that the beating rose to the level of persecution, Sanchez's claim would nonetheless fail because he did not demonstrate that it was "on account of" his actual or imputed political opinion.  *See Sagaydak v. Gonzales*, 405 F.3d 1035, 1042 (9th Cir. 2005) (to establish a nexus between persecution and political opinion, applicant must show either an affirmative or imputed political opinion and establish that he was targeted because of the political opinion).  According to Sanchez, the motive for the attack by the Alvarados was their fear that he would avenge his father's death.  Hence, even if – as Sanchez contends – the Alvarados killed Sanchez's father because of the father's politics, there is no indication that the brothers believed that Sanchez shared his father's political beliefs or that they attacked him because of his own political opinion.  Moreover, as the immigration judge found, Sanchez failed to establish in the first place that his father was killed on account of his political beliefs.  Sanchez and Burgos both testified that the Alvarado brothers and their father were members of the Nationalist party and that the brothers were jealous of the father's wealth and power.  Without any indication that there was some intra-party struggle or a disagreement relating to the father's political beliefs, the record simply does not compel the conclusion that the father was killed on account of his political beliefs and, indeed, it appears likely that he was killed due to jealousy and greed, a reprehensible, but not statutorily protected, ground.

Sanchez has therefore failed to establish that he was subjected to past persecution on account of his political opinion or that he otherwise has a well-founded fear of future persecution. He likewise did not establish his eligibility for withholding of removal or relief under the Convention Against Torture. *Yu v. Ashcroft*, 364 F.3d 700, 703, n. 3 (6th Cir. 2004) ("Since Yu does not establish eligibility for asylum, he does not meet the more stringent standards required for withholding or the Torture Convention.")

The petition for review is DENIED.