**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 4, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

PEDRO MIGUEL
CARRANZA-QUINONES,

        Petitioner,

v.

MICHAEL B. MUKASEY,
United States Attorney General,

        Respondent.

No. 07-9540
(Petition for Review)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE**, **PORFILIO**, and **BALDOCK**, Circuit Judges.

---

Petitioner Pedro Miguel Carranza-Quinones is a native and citizen of Peru.

He challenges the Board of Immigration Appeals (BIA's) decision affirming an

immigration judge's (IJ's) order that denied his asylum application. We deny the

petition.[1]

---

[*]     After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1]     It does not appear that Carranza-Quinones is challenging the adverse

(continued...)

## BACKGROUND

In Peru, Carranza-Quinones worked as an accountant, and was "well-positioned economically." Admin. R. at 300. In February 2000, eight police officers entered Carranza-Quinones' home without judicial authorization and planted cocaine inside. They hit Carranza-Quinones on the head once with a pistol, causing a bump, and demanded $2,000 to destroy a document indicating that the drugs were his. According to Carranza-Quinones, "the police do this to people that make a good living, people that have a job." *Id.* at 293.

Carranza-Quinones' wife gave the officers $1,000, and they took Carranza-Quinones to a jail to secure payment of the remainder. Three days later, his wife contacted Carranza-Quinones' brother, a Peruvian diplomat, who in turn notified the Peruvian police's anti-corruption unit. The eight officers were arrested, and ultimately, seven were convicted in a "police trial." *Id.* at 280-81. During the ordeal, Carranza-Quinones spent twelve days in custody.

Afterward, he received frequent—apparently anonymous—telephone calls threatening "that if [he] kept talking, they were going to kill [him]." *Id.* at 286. As a result of the threats, Carranza-Quinones received police protection.

---

[1](...continued)
administrative determinations on his claims for restriction on removal and withholding of removal under the Convention Against Torture (CAT). In any event, because Carranza-Quinones cannot establish that he was persecuted for purposes of obtaining asylum, he "necessarily fail[s] to meet the higher standards required for restriction on removal . . . or withholding of removal under the [CAT]." *Solomon v. Gonzales*, 454 F.3d 1160, 1163 (10th Cir. 2006).

-2-

One day in 2003, he saw one of the officers who had been involved in the extortion plot and who now worked for the Peruvian immigration department. That person said that if he (Carranza-Quinones) did not stop talking, "something bad" would happen that would "make it impossible for [Carranza-Quinones] to renew [his] passport." *Id.* at 293. Carranza-Quinones left Peru several weeks later, entered the United States on a non-immigrant visa, and applied for asylum, restriction on removal, and protection under the CAT. After his visa expired, the Department of Homeland Security commenced removal proceedings and ordered him to appear for a hearing before an IJ.

At the hearing, Carranza-Quinones testified that he feared returning to Peru because he had brought down several police officers. Carranza-Quinones also testified that in Peru he organized meetings for "Peru Possible," a political party that opposed government corruption and President Alberto Fujimori. *Id.* According to Carranza-Quinones, the officers in the extortion plot were aligned with President Fujimori.

The IJ ordered Carranza-Quinones removed to Peru, finding that the extortion incident was not connected to his political opinion or any other ground sufficient to qualify for relief. The BIA affirmed the IJ's decision, stating that Carranza-Quinones failed to support his claim that the harm and fear he experienced was "inflicted on account of [his] political opinion." *Id.* at 30. Carranza-Quinones then filed in this court the instant petition for judicial review.

## DISCUSSION

### I.  Standard of Review

Where, as here, the BIA issues a brief, one-member order, our review focuses on the BIA's order, rather than the IJ's decision.  *Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007).  But "when seeking to understand the grounds provided by the BIA, we are not precluded from consulting the IJ's more complete explanation of those same grounds."  *Id.* (quotation omitted).  We will not disturb the BIA's determination if it is supported by "reasonable, substantial and probative evidence."  *Id.* at 788 (quotation omitted).

### II.  Asylum

"To qualify for asylum, an alien must show that he has suffered past persecution or has a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."  *Id.* (quotations and alteration omitted).  Carranza-Quinones focuses on the last category—political opinion.  He seems to argue that he was extorted because of his association with Peru Possible.  But there is absolutely no evidence in the record of a nexus between Carranza-Quinones' political association and the extortion plot.  Indeed, Carranza-Quinones testified that he thought Peruvian police extorted people because they were financially well off.  *See* Admin. R. at 293.  And while the officers who extorted Carranza-Quinones may have been aligned with Peru Possible's opponent, President Fujimori, that fact alone is

insufficient to show that there was persecution "on account of" political opinion. *See Sangha v. INS*, 103 F.3d 1482, 1487 (9th Cir. 1997) (observing that persecution on account of political opinion requires "something more than violence plus disparity of views").

Carranza-Quinones also contends that the death threats he received for exposing the extortion plot qualify as persecution on account of political opinion. Our circuit has not yet addressed the circumstances under which retaliation for exposing government corruption can be treated as persecution "on account of . . . political opinion." *Sarr*, 474 F.3d at 788.[2]  Other "courts have held that whistleblowing against corrupt government officials may constitute political activity sufficient to form the basis of persecution 'on account of political opinion,' as can the refusal to accede to government corruption." *Bu v. Gonzales*, 490 F.3d 424, 431 (6th Cir. 2007) (collecting cases).  Even in those cases, however, "the salient question is whether [the whistleblower's] actions were directed toward a governing institution, or only against individuals whose corruption was aberrational." *Grava v. INS*, 205 F.3d 1177, 1181 (9th Cir. 2000).

---

[2]    We assume, without deciding, that the death threats against Carranza-Quinones are of sufficient magnitude to constitute persecution. *See Sidabutar v. Gonzales*, 503 F.3d 1116, 1124 (10th Cir. 2007) (stating that persecution requires "more than just . . . threats to life and liberty" (quotation omitted)); *Yuk v. Ashcroft*, 355 F.3d 1222, 1234 (10th Cir. 2004) (stating that threats alone may constitute persecution "when they are so immediate and menacing as to cause significant suffering or harm in themselves" (quotation omitted)).

When the corruption is aberrational, it tends to indicate that the reprisals against the whistleblower are intended "to shut [the whistleblower] up for purely self-protective reasons," rather than to punish the whistleblower for voicing a political opinion about government misconduct. *See Marquez v. INS*, 105 F.3d 374, 381 (7th Cir. 1997).

Here, Carranza-Quinones exposed the extortion plot of eight officers of the Peruvian police force. That institution was not involved in the plot, and in fact, its anti-corruption unit intervened on Carranza-Quinones' behalf and arrested the officers, convicted seven of them, and later provided protection when Carranza-Quinones began receiving death threats. No evidence in the record compels the conclusion that the criminal acts of those officers were typical of Peruvian police officers or that the anti-corruption unit's intervention was an anomaly. *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992) (identifying the quantum of evidence necessary to overturn the BIA's asylum-eligibility determination). Consequently, we conclude that Carranza-Quinones was threatened for purely self-protective reasons, and not because of his political opinion against corruption. *See Marquez*, 105 F.3d at 381.

## CONCLUSION

The BIA did not err in concluding that Carranza-Quinones failed to establish his eligibility for asylum. Accordingly, the petition for review is DENIED.

Entered for the Court

Bobby R. Baldock
Circuit Judge