**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 07a0575n.06
Filed: August 10, 2007

**Nos. 05-4584; 06-3330; 06-3705**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

KRIST NIKOLLBIBAJ, et al.,

     Petitioners,

v.

ALBERTO GONZALES, ATTORNEY
GENERAL,

     Respondent.

ON APPEAL FROM THE BOARD OF
IMMIGRATION APPEALS

_____/

BEFORE:    MARTIN, BATCHELDER and CLAY, Circuit Judges.

    **CLAY, Circuit Judge.**  Petitioner Krist Nikollbibaj, his wife, Lindita Nikollbibaj, and daughter, Donika Nikollbibaj (collectively, "Petitioners")[1] applied for 1) asylum under the Immigration and Nationality Act ("INA") § 208, 8 U.S.C. § 1158; 2) withholding of removal under INA § 241(b)(3), 8 C.F.R. § 208.16; and 3) protection under the United Nations Convention Against Torture ("Torture Convention"), 8 C.F.R. § 208.16. An Immigration Judge ("IJ") denied Petitioners' asylum applications on May 14, 2004. The Board of Immigration Appeals ("BIA") summarily

---

[1] The record is unclear whether Petitioners' last name is "Nikolbibaj" or "Nikollbibaj." *Compare* J.A. 474 *with* J.A. 465. This opinion uses "Nikollbibaj," the last name to appear in Petitioners' passports.

dismissed Petitioners' appeal and denied three motions to reopen. Petitioners appeal the BIA's

denial of the motions to reopen. For the reasons that follow, we **AFFIRM** the BIA's decision and

**DENY** the petitions for review.

## BACKGROUND

Petitioners are ethnic Albanians from Kosovo and Roman Catholics. Petitioner "completed

the middle school and the high school . . . . [i]n 1989," (J.A. 369), and served for one year as a "foot

soldier" in the army of the former Yugoslavia, (J.A. 371). He maintains that his older brothers,

Xhevalin Nikollbibaj ("Xhevalin") and Vitor Nikollbibaj ("Vitor"), were actively involved in

political activities in Kosovo.

The record shows that "Serbian police authorities," (J.A. 350), arrested and interrogated

Xhevalin for "believing [in] human rights for Albanian people[,] . . . talking, [ ] spreading mail,

[and] trying to convince people" to support Kosovo independence, (J.A. 351). In 1992, Xhevalin

came to the United States and was granted asylum. Notably, after leaving Yugoslavia, Xhevalin was

convicted *in absentia* of making public political statements:

> . . . on April 18, 1992 at about 9 p.m. in the restaurant RINIA in
> Djakovica, in the presence of a considerable number of patrons,
> [Xhevalin] did shout the slogans: "Kosovo a Republic," "Kosovo
> Belongs to the Albanians," and "We will Not Tolerate Serbian
> Occupation, Because This Country Belongs Only to the Albanians,"
> – thereby committing a criminal act against the foundations of the
> social system of socialist self-management and the security of the
> [Socialist Federal Republic of Yugoslavia] under Article 114 of the
> Yugoslav Criminal Code. Whereupon . . . . the court hereby
> SENTENCES the defendant Xhevalin [ ] to a term of 5 (five) years
> in prison.

(J.A. 476) (formatting added). Xhevalin's persecution in Kosovo, as a result of his political activities, is well established in the record.

With respect to Vitor, the record shows that he was involved with the Democratic League ("LDK"), a political party that "aim[s] [ ] to show to the world the massacres that [Albanian] people [have] suffered" in Kosovo. (J.A. 372) Since the "former Yugoslavia was together, [ ] they used to call [LDK members] separatists" because LDK "wanted to separate Yugoslavia as a country." (J.A. 325) Vitor testified that he

> start[ed] writing slogans on buildings. [LDK] wrote slogans, slogans all over the place. [LDK] want[ed] to separate from Yugoslavia; [ ] [and] want[ed] Kosovo to be a republic. And so in the meantime, a lot of police from Serbia was transported, and they came, and they sent them into Kosovo, and they started investigating [LDK] . . . . Sometimes they beat [LDK members], sometimes they let [LDK members] go, sometimes threaten[ed] . . . to kill [LDK members].

(J.A. 326-27) Vitor was arrested "two times from home," detained, interrogated, and beaten by the police. (J.A. 329) The record indicates that Vitor "left [Kosovo] because of a Serb abusement (sic) that they did to . . . [him] and [his] family, for . . . anti-government ideas that [they] had." (J.A. 324-25) In 1985, Vitor came to the United States and applied for asylum, but became a "lawful permanent residen[t] through cancellation of removal before his asylum application was adjudicated." (Pet. Br. at 13; *see also* J.A. 323-24)

Petitioner maintains that, like Xhevalin and Vitor, he joined LDK and became politically active. More specifically, he alleges that "[a]fter [he] completed military service . . . [he] started to be involved with Democratic League." (J.A. 372) According to Petitioner,

> together with [his] brother Xhevalin, [he] [ ] spread . . . papers saying the Kosovo Republic. So, [he] helped [his] brother Xhevalin to

3

distribute those papers . . . . [and] in 1992, [he] got the membership card of the Democratic League.

(J.A. 374) Although he does not provide specific details, Petitioner maintains that the Serbian police targeted him and frequently detained and interrogated him because of his brothers' and his own political activities. *See, e.g.*, J.A. 382 (Petitioner alleges that Serbian police "question[ed] [him] a couple of times about [his] brothers.").

Petitioner alleges that, in the course of his involvement with LDK, "[he] was promoted" and became "head of the group for the village," or "leader of the Village." (J.A. 375) Petitioner affirms that he "led 10,000 LDK members in [his] village." (J.A. 376) As a party leader, Petitioner's "duty was to tell the people . . . to liberate Kosovo through peaceful means, not war." *Id.* He held "secret meetings, and then communicated with different people during those meetings." *Id.* With respect to these meetings, Petitioner testified as follows:

> Question: How often would you have these secret meetings?
> Answer: So there were about two, three days a week. During the difficult time when immediately before the war, then we had them more often.
> Question: How many people would be at each of these meetings?
> Answer: Around – sometimes there were 2,000, 3,000; sometimes there were 500, around 500. But most they were – some of them were scared of the police.
> Question: Where would you have these meetings?
> Answer: Sometimes we had them in secret places. Yeah, sometimes in the mountains where the police couldn't see us.

(J.A. 377) (formatting added).

Petitioner affirms that before leaving Kosovo, the Kosovo Liberation Army ("KLA"), an ethnic Albanian guerilla force fighting for Kosovo independence, "called on [him] and requested that

4

[he] join them." (J.A. 385) Although Petitioner did not join the KLA "[b]ecause [he] [ ] was for peace, not war," (J.A. 386), the Serbian police "thought that [he was] also fight[ing] for KLA," (J.A. 400). Petitioner alleges that during his last encounter with the Serbian police, law enforcement officials "tore the shirt of [his] spouse off" and "told [him] that they were going to do anything with [his] wife . . . [and] kill [his] wife," unless Petitioner disclosed "which party [he was] working for and who [he was] working with." (J.A. 383) During this encounter, Petitioner was allegedly detained and taken to a police station. While Petitioner was detained, Petitioner's wife was allegedly raped by five Serbian police officers in front of her daughter, mother-in-law, sister-in-law, and other family members. Petitioners fled Kosovo in July 1998, a week after the alleged rape.

Petitioners traveled from Kosovo to Hungary. Because they were "afraid that [Hungary] might turn [them] back" to Kosovo, Petitioners traveled to Austria. (J.A. 384) They remained in Austria for "five, [or] six months," (J.A. 392), living in a camp for asylum applicants, "in a room where slept on 100 – or 200 people," (J.A. 415). Petitioners maintain that they applied for asylum, but Austria "denied [the] application for asylum." (J.A. 392) After the Austrian asylum applications were denied, Petitioners traveled "from Austria . . . to Germany, and from Germany . . . to Holland." (J.A. 385) Finally, Petitioners entered the United States on December 31, 1998, with false "Slovenian passports" under the visa waiver program. (J.A. 385; *see also* 8 U.S.C. § 1187(a)). Petitioner maintains that "[i]f [he] get[s] back to Kosovo, the Serbs will get back, and the KLA is going after everyone who has left Kosovo and didn't fight against the Serbs." (J.A. 389) Essentially, Petitioner argues that he will be viewed as a traitor and Serb-collaborator, and that the KLA will target him because he refused to join the guerilla forces.

5

On December 30, 1999, Petitioners retained an attorney, David Paruch ("Paruch"), and applied for asylum.[2] Since the first asylum applications were rejected by the INS, Petitioners re-submitted the applications on January 6, 2000. The second asylum applications were also rejected. Petitioners did not resubmit the applications until September 17, 2001. *See* J.A. 294 (IJ indicates that the record contains "an administratively filed application [for asylum] that was filed actually three times, or attempted to be filed three times.").

On November 8, 2001, Petitioners were served with a "Notice of Referral to Immigration Judge," (J.A. 509-14), pursuant to 8 C.F.R. § 208.2(b), because as aliens admitted under the visa waiver program, Petitioners waived the right "to contest, other than on the basis of an application for asylum, any action for removal of the alien." 8 U.S.C. § 1187(b). Petitioners appeared before an IJ and indicated that they were "seeking asylum and withholding [of removal] under the statute and the Torture Convention." (J.A. 293) Since the IJ was "not sure [he] even had a valid asylum application before the Court," Petitioners' were directed to "[f]ill out [a] new form . . . . [a]nd attempt to explain in that new form what happened" with their prior attempts to file the asylum application. (J.A. 297)

The IJ held an evidentiary hearing on the merits of Petitioners' asylum applications on May 14, 2004. At the hearing, Petitioner, his wife and brothers testified about their alleged persecution in Kosovo. Compared to his brothers' accounts of their political activities and persecution, Petitioner's testimony was vague and conclusory. Petitioners also proffered expert testimony on

---

[2] It is unclear whether Petitioners filed their first asylum applications on December 30, 1999, or December 31, 1999. Since Petitioners filed their last asylum application on September 17, 2001, the exact date of the first filing is not relevant for purposes of this appeal.

"Kosovar government and politics or Balkan government and politics," (J.A. 429), from Bernd J. Fischer, Ph.D., a professor at Indiana University and Purdue University, (J.A. 457-64). Dr. Fischer testified that "the situation [in Kosovo] is rather chaotic" because "there was essentially [a] mini-civil war in Kosovo." (J.A. 431) He explained that

> not only are there threats, there is actual retribution. Kosovo has a fairly high crime rate, and much of this crime is basically Albanian on Albanian crime; in other words, individuals who have taken it upon themselves to rid the ethnic Albanian community of individuals that they assume to be traitors.

(J.A. 435) Dr. Fischer explained that the traitors are people "who cooperated with Serbs during the war, those who were not sufficiently anti-Serb during the war, those who refused to participate in the war, those who left; and, on occasion, failed political asylum seekers." *Id.* Dr. Fischer testified that international and local law enforcement forces "are not particularly effective" in protecting the targets of these attacks. (J.A. 436)

At the hearing, Petitioners also submitted country condition reports from the United States Department of State indicating that "Serbian forces killed up to 10,000 mostly male ethnic Albanians, often in brutal fashion." (J.A. 482) The reports indicate that in Kosovo "[v]irtually no town or settlement escaped the effects of Milosevic's campaign of ethnic cleaning, with reports of dozens, if not hundreds of civilians being murdered in each town." (J.A. 483)

At the conclusion of the evidentiary hearing, the IJ denied Petitioners' asylum applications, finding that Petitioners were ineligible for asylum because they "lived in Austria for five or six

7

years," (J.A. 30), and "bec[a]me permanently resettled in Austria," (J.A. 31);[3] and that the applications were untimely because they were "ultimately not filed until September 17, 2001," (J.A. 32). The IJ "also reject[ed] the application on its merits," finding that Petitioners were not credible because they "cannot tell a consistent or a straight story." (J.A. 34)

Petitioners filed a timely notice of appeal to the BIA. Paruch filed a motion for an extension of time to "complete briefing of [the] issues" because "the Easter Holiday and associated family issues [ ] interfere[d] with timely submission of the brief." (J.A. 276) Although the BIA granted the motion, Petitioners failed to submit the brief by the April 20, 2005 deadline. On July 28, 2005, the BIA "summarily dismissed" Petitioners' appeal, for failure to file a brief, pursuant to 8 C.F.R. § 1003.1(d)(2)(i)(E). (J.A. 270) Petitioners did not file a petition for review from the BIA's dismissal. On August 31, 2005, Petitioners filed a motion to reopen with the BIA, indicating that "at about the time th[e] brief was due, [Paruch] underwent surgery for prostate cancer." (J.A. 258) Indeed, the record indicates that Paruch had "Laparascopic Prostatectomy with Robotic Assistance for Prostate Ct [sic]." (J.A. 271)

On November 22, 2005, the BIA denied the motion to reopen. The BIA stated that "[i]nasmuch as it appears that the applicants are requesting that [the BIA] reconsider [the] prior decision . . . the request for reconsideration was filed more than 30 days after [the] decision and, therefore, is untimely." (J.A. 12) The BIA acknowledged that Petitioners submitted "a hospital record showing that [Paruch] was admitted to the hospital on April 5, 2005, and discharged on April

_____

[3] The IJ found that Petitioners lived in Austria for five or six years. However, Petitioners testified that they lived in Austria for five or six months. *Compare* J.A. 30 *with* J.A. 392.

7, 2005," but noted that the brief was due on April 20, 2005, and that Petitioners "d[id] not specify the length of the attorney's recovery period." *Id.* The BIA stated that "the motion does not explain why the applicants waited more than 4 months after the brief was due to file the request to consider the late-filed brief." *Id.*

After the BIA denied the first motion to reopen, Petitioners retained new counsel, Hani Alex Azzam[4] ("Azzam"), to file a second motion to reopen. On December 20, 2005, Azzam filed a motion to reopen Petitioners' asylum case with the BIA raising an ineffective assistance of counsel claim, and petitioned this Court to review the BIA's denial of the first motion to reopen.[5]

The BIA denied Azzam's motion on February 21, 2006, under 8 C.F.R. § 1003.2(c)(2), because "[t]he motion to reopen exceeds the numerical limitations for motions to reopen." (J.A. 10) The BIA also found that Petitioners "failed to meet the requirements for making an ineffective assistance of counsel claim." *Id.* More specifically, Petitioners "failed to provide either an affidavit in support of their motion or any evidence that they have given former counsel an opportunity to respond to their allegations" of ineffective assistance of counsel. *Id.*

After the BIA denied Azzam's motion to reopen, Petitioners retained Marshal Hyman ("Hyman"), the attorney currently litigating this case, as counsel. Hyman filed a petition for review

---

[4] The record shows that Azzam was "administratively suspended from the practice of law" in Massachusetts and with the BIA, from July 21, 2005, to October 26, 2005. (J.A. 164; *see also* J.A. 165) Petitioners concede that they did not know about Azzam's suspension. Since Petitioners engaged Azzam to file a new motion to reopen after the BIA denied the first motion to reopen on November 22, 2005, it does not appear that Azzam represented Petitioners while he was suspended.

[5] Since Azzam failed to include Petitioner's wife in the petition for review to the Sixth Circuit, Petitioners filed a second petition for review.

from the BIA's February 21, 2006 decision, and a motion to reopen with the BIA alleging that Petitioners were prejudiced by Paruch's and Azzam's ineffective assistance of counsel. The BIA denied this third motion to reopen on May 4, 2006, finding that it was "barred by numerical limitations." (J.A. 8) The BIA stated that it had already "considered the arguments as to ineffective assistance of counsel . . . regarding the actions of [ ] former attorney, [ ] Paruch . . . and decline[d] to revisit" that issue. (J.A. 7) The BIA also found that it could not address the issue of Azzam's ineffective assistance because Petitioners "failed to comply with [the] critical [ ] requirement" that "before allegations of ineffective assistance of former counsel are presented to the [BIA], former counsel must be informed of the allegations and allowed the opportunity to respond." (J.A. 8) (internal quotation marks and citation omitted). Petitioners filed a timely petition of review with this Court.[6] On appeal, Petitioners argue that the BIA erroneously denied the three motions to reopen.

## DISCUSSION

### I. Standard of Review

This Court reviews the denial of a motion to reopen for an abuse of discretion. *See, e.g., INS v. Doherty*, 502 U.S. 314, 323 (1992); *see also INS v. Abudu*, 485 U.S. 94, 107 (1988) (holding that BIA reopening "decisions are subject to an abuse-of-discretion standard of review."). "The [BIA's] discretion is broad but it is not unlimited. It may not exercise its discretion in a way that is arbitrary, irrational or contrary to law." *Daneshvar v. Ashcroft*, 355 F.3d 615, 625-26 (6th Cir. 2004) (citations omitted). "Cursory, summary, or conclusory statements are inadequate" in BIA decisions. *Id.* (citations omitted). "'In determining whether the [BIA] abused its discretion, this Court must decide

---

[6] This Court has consolidated the three petitions for review in this case.

whether the denial of [the] motion to reopen . . . was made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as invidious discrimination against a particular race or group.'" *Sako v. Gonzales*, 434 F.3d 857, 863 (6th Cir. 2006) (quoting *Allabani v. Gonzales*, 402 F.3d 668, 675 (6th Cir. 2005)).

## II. The Motions to Reopen

### A. Statutory and Legal Framework

"The granting of a motion to reopen is [ ] discretionary, and the Attorney General has broad discretion to grant or deny such motions." *Doherty*, 502 U.S. at 323 (internal quotation marks and citations omitted). Under 8 C.F.R. § 1003.2(a),

> [t]he [BIA] may at any time reopen or reconsider . . . any case in which it has rendered a decision. A request to reopen . . . must be in the form of a written motion to the [BIA]. *The decision to grant or deny a motion to reopen or reconsider is within the discretion of the [BIA] . . . . The [BIA] has discretion to deny a motion to reopen even if the party moving has made out a prima facie case for relief.*

8 C.F.R. § 1003.2(a) (formatting and emphasis added). Under 8 C.F.R. § 1003.2(c)(1),

> motion to reopen proceedings shall not be granted unless it appears to the [BIA] that evidence sought to be offered is material and was not available and could not have been discovered or presented at the former hearing; nor shall any motion to reopen for the purpose of affording the alien an opportunity to apply for any form of discretionary relief be granted if it appears that the alien's right to apply for such relief was fully explained to him or her and an opportunity to apply therefore was afforded at the former hearing.

8 C.F.R. § 1003.2(c)(1). "[T]he motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal." 8 U.S.C. § 1229a(c)(7)(C)(i); *see also* 8 C.F.R. § 1003.2(c)(2) ("[A] party may file only one motion to reopen deportation or exclusion proceedings

11

(whether before the Board or the Immigration Judge) and that motion must be filed no later than 90 days after the date on which the final administrative decision was rendered in the proceeding sought to be reopened."). "Motions for reopening of immigration proceedings are [generally] disfavored," *Doherty*, 502 U.S. at 323, because "[t]here is a strong public interest in bringing litigation to a close [ ] promptly," *Abudu*, 485 U.S. at 107.

## B.      The First Motion to Reopen

The BIA dismissed Petitioners' appeal for failure to file the brief on July 28, 2005. Under 8 U.S.C. § 1229a(c)(6)(C)(i), a "motion to reopen shall be filed within 90 days of the date of entry of a final administrative order of removal." 8 U.S.C. § 1229a(c)(6)(C)(i). The record shows that the motion to reopen was filed on August 31, 2005, approximately one month after the BIA dismissed the case. Contrary to the BIA's finding, the record indicates that Petitioners' motion to reopen was filed within the ninety-day statutory time period.

Nevertheless, in the motion to reopen, Petitioners requested that the BIA accept a brief more than four months after the April 20, 2005 filing deadline. Petitioners' explained that they waited four months to file the brief because Paruch had surgery for prostate cancer and could not prepare the brief. The BIA found that the only document Petitioners submitted in connection with Paruch's surgery was a hospital record which indicated that Paruch was admitted to the hospital on April 5, 2005, and discharged on April 7, 2005. Since the record did not contain any information about the length of Paruch's recovery period or the extent of his incapacitation after the surgery, the BIA found that Petitioners' contention that Paruch could not file the brief was unsubstantiated. Petitioners simply cannot show that the BIA's decision was an abuse of discretion because the brief was due on

April 20, 2005, and Paruch may have been able to submit the brief after his surgery. Even if Paruch was incapacitated by the surgery, Petitioners could have requested an extension of time to file the brief. We find that the BIA did not abuse its discretion in denying the first motion to reopen because Petitioners failed to substantiate their claim that the brief could not have been filed on a timely basis.

### C.      The Second Motion to Reopen

The BIA denied the second motion to reopen because "[an] alien may [only] file one motion to reconsider a decision that the alien is removable from the United States." 8 U.S.C. § 1229a(c)(6)(A). "The [second] motion to reopen exceed[ed] the numerical limitations for motions to reopen." (J.A. 10) Petitioners also "failed to meet the requirements for making an ineffective assistance of counsel claim" because they did not "provide either an affidavit in support of their motion or any evidence that they have given [Paruch] an opportunity to respond to their allegations." *Id.*

In *Matter of Lozada*, the BIA set forth procedures for asserting an ineffective assistance of counsel claim. 19 I. & N. Dec. 637, 639 (BIA 1998). In pertinent part, *Lozada* provides that:

> A motion based upon a claim of ineffective assistance of counsel should be supported by an affidavit of the allegedly aggrieved respondent attesting to the relevant facts . . . that affidavit should include a statement that sets forth in detail the agreement that was entered into with former counsel with respect to the actions to be taken on appeal and what counsel did or did not represent to the respondent in this regard. Furthermore, before allegations of ineffective assistance of former counsel are presented to the [BIA], former counsel must be informed of the allegations and allowed the opportunity to respond. Any subsequent response from counsel, or report of counsel's failure or refusal to respond, should be submitted with the motion. Finally, if it is asserted that prior counsel's handling of the case involved a violation of ethical or legal responsibilities, the motion should reflect whether a complaint has been filed with

13

appropriate disciplinary authorities regarding such representation, and if not, why not.

*The high standard announced here is necessary if we are to have a basis for assessing the substantial number of claims of ineffective assistance of counsel that come before the Board.*

*Id.* (emphasis added). This Court has found that "[s]ound policy reasons support compliance with the *Lozada* requirements." *Hamid v. Ashcroft*, 336 F.3d 465, 469 (6th Cir. 2003). "The requirements facilitate a more thorough evaluation by the BIA and discourag[e] baseless allegations." *Id.* (internal quotation marks and citation omitted) (alteration in original). The "failure to comply" with the *Lozada* requirements "results in a forfeiture of [the] ineffective-assistance-of-counsel claim." *Id.*

Petitioners argue that Azzam complied with *Lozada*, but concede that the second motion to reopen "failed to include proof that he complied with the [*Lozada*] procedural requirements." (J.A. 118) Azzam's actual compliance with *Lozada* does not cure Petitioners' failure to include proof of compliance. *Lozada* expressly requires the submission of an affidavit and supporting documentation. The BIA did not abuse its discretion in denying the second motion to reopen because no evidence of compliance with *Lozada* was before the BIA when it denied the motion to reopen.

**D.    The Third Motion to Reopen**[7]

---

[7] Petitioners' third motion was a motion for reconsideration. The BIA construed the motion as a motion to reopen because Petitioners raised new ineffective assistance of counsel claims against Azzam. *See, e.g.*, *Matter of Cerna*, 20 I. & N. Dec. 399, 400 (BIA 1991) (holding that if a motion for reconsideration raises new arguments or evidence that was not previously in the record, it should be construed as a motion to reopen.).

In the third motion to reopen, Petitioners sought to introduce new evidence of compliance with *Lozada* and raised new allegations of ineffective assistance of counsel against Azzam. The BIA found that the third motion was numerically barred, and that Petitioners failed to show that they provided Azzam with an opportunity to respond to the allegations of ineffective assistance.

Admittedly, the record indicates that Petitioners notified Azzam of their allegations on March 15, 2006. However, the third motion to reopen, which included allegations of Azzam's ineffective assistance, was filed on March 17, 2006. "Even if [Petitioners] [ ] presented evidence that [they] notified" Paruch of their allegations, Petitioners have "failed to meet *Lozada's* requirement that counsel be provided an opportunity to respond before filing the motion to reopen." *Asaba v. Ashcroft*, 377 F.3d 9, 12 (1st Cir. 2004) (citation omitted). Because Petitioners filed the motion two days after notifying Azzam, they "afford[ed] [Azzam] no opportunity to furnish a timely response and thus sidestepp[ed] *Lozada's* requirement to submit any subsequent response from counsel with the motion to reopen." *Reyes v. Ashcroft*, 358 F.3d 592, 594 (9th Cir. 2004) (internal quotation marks and citation omitted). Simply put, two days were not sufficient to provide Azzam with an opportunity to respond to the ineffective assistance allegations. *See, e.g.*, *Asaba*, 377 F.3d at 12 (finding that "three days does not provide [counsel] an adequate opportunity to respond to the allegations.") (internal quotation marks and citation omitted). Therefore, we find that the BIA did not abuse its discretion in denying the third motion to reopen.

**III.** **Petitioners' Ineffective Assistance of Counsel Claims**

Petitioners argue that the BIA erred in denying the motions to reopen because their ineffective assistance of counsel claims have merit. Contrary to Petitioners' averments, the ineffective assistance of counsel claims are meritless.

**A.** **The Legal Framework for Ineffective Assistance of Counsel Claims in Immigration Cases**

Since "[i]mmigration proceedings [ ] are civil, rather than criminal, in nature[,] [ ] the Sixth Amendment guarantee of effective counsel does not attach." *Xu Yong Lu v. Ashcroft*, 259 F.3d 127, 131 (3d Cir. 2001) (citing *INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038 (1984)). "Nonetheless, petitioners in deportation proceedings enjoy Fifth Amendment Due Process protections." *Id.*; *see also Dokic v. INS,* No. 92-3592, 1993 WL 265166, at *3 (6th Cir. July 15, 1993) (unpublished case). Ineffective assistance of counsel could constitute a denial of due process "if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." *Lozada v. INS*, 857 F.2d 10, 13-14 (1st Cir. 1988) (internal quotation marks and citations omitted); *see, e.g.*, *Hernandez v. Reno*, 238 F.3d 50, 55 (1st Cir. 2001) ("[W]here counsel does appear for the respondent, incompetence in some situations may make the proceeding fundamentally unfair and give rise to a Fifth Amendment due process objection.") (citation omitted); *Castaneda-Suarez v. INS*, 993 F.2d 142, 144 (7th Cir. 1993) ("[C]ounsel at a deportation hearing may be so ineffective as to have impinged upon the fundamental fairness of the hearing in violation of the fifth amendment due process clause.") (internal quotation marks and citation omitted); *Ramirez-Durazo v. INS*, 794 F.2d 491, 499-500 (9th Cir. 1986).

In the instant case, the record clearly shows that Paruch missed the deadline for filing the appeal brief with the BIA, and waited more than four months – until the BIA dismissed Petitioners' appeal – to request that the BIA accept the untimely brief. Admittedly, Paruch's conduct strongly suggests that Paruch's representation failed to satisfy professional standards. However, to establish ineffective assistance of counsel Petitioners must have "a viable claim for discretionary relief." *Cortez-Herrera v. Gonzales*, No. 04-75735, 2007 WL 1482395, at *1 (9th Cir. May 22, 2007) (unpublished case). Petitioners must be prejudiced by counsel's ineffective assistance. "The alien carries the burden of establishing that ineffective assistance of counsel prejudiced him or denied him fundamental fairness in order to prove that he has suffered a denial of due process." *Huicochea-Gomez v. INS*, 237 F.3d 696, 699 (6th Cir. 2001) (citation omitted) (expressly holding that the BIA's failure to accept an untimely brief does not amount to a denial of due process because petitioners were ineligible for cancellation of removal); *see also Sako*, 434 F.3d at 865 ("[T]he loss of a right to appeal the BIA's decision to this court and the accrual of unlawful presence do not constitute prejudice under this circuit's law.") (citation and internal quotation marks omitted) (alteration in original); *Komi v. Gonzales*, 186 F. App'x 597, 601 (6th Cir. 2006) (noting that "even if Petitioners' ineffective assistance of counsel claim had met the *Lozada* requirements, they would still be required to show prejudice. The loss of the right to appeal is not sufficient prejudice; Petitioners must show that, but for their counsel's ineffective assistance, they would have been allowed to remain in the country.") (citation omitted). In this case, Petitioners cannot show that Paruch's and Azzam's ineffective representation constitutes prejudice because their asylum claims are meritless. The merits of Petitioners' asylum claims will be discussed below.

**B.      The Legal Framework for Asylum Claims**

To be eligible for asylum, an alien must present evidence of actual past persecution, or have a well-founded fear of future persecution on account of race, religion, nationality, membership of a particular social group or political opinion.  INA § 101(a)(42)(A), 8 U.S.C. § 1101(a)(42)(A); *Singh v. Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005); *INS v. Cardoza-Fonseca*, 480 U.S. 421, 438 (1987).  An alien who satisfies the burden of showing past persecution is presumed to have a well-founded fear of future persecution.  8 C.F.R. §§ 208.13(a) and 208.13(b)(1)(i); *see also Ouda v. INS*, 324 F.3d 445, 455 (6th Cir. 2003).  The fear of persecution must be both subjectively genuine and objectively reasonable.  *Mikhailevitch v. INS*, 146 F.3d 384, 389 (6th Cir. 1998).  The fear of persecution may be established either through the production of specific documentary evidence or by credible and persuasive testimony.  *Id.*  Past persecution does not require corroborative evidence, *Garrovillas v. INS*, 156 F.3d 1010, 1016 (9th Cir. 1998), because an applicant's "testimony . . . if credible, may be sufficient to sustain the burden of proof without corroboration," 8 C.F.R. § 1208.13(a); *see also Hassan v. Gonzales*, 403 F.3d 429, 434 (6th Cir. 2005).

The IJ's credibility determinations are considered findings of fact, and are reviewable under the substantial evidence standard and "are treated as conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." *Hassan*, 403 F.3d at 434 (quotation and citation omitted); *see also Abay v. Ashcroft*, 368 F.3d 634, 637 (6th Cir. 2004).  Although the IJ's credibility finding is afforded substantial deference, the finding should be supported by specific reasons. *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 n.7 (6th Cir. 2004).  "An adverse credibility finding must be based on issues that go to the heart of the applicant's claim," *Sylla v. INS*, 388 F.3d 924, 926 (6th

Cir. 2004), and cannot be based on irrelevant inconsistencies, *Daneshvar*, 355 F.3d at 623 n.7. The IJ's determination with respect to the availability of corroborating evidence cannot be reversed unless the Court finds that a reasonable trier of fact is compelled to conclude that such corroborating evidence is unavailable. INA § 242(b)(4), 8 U.S.C. § 1252(b)(4).

### C.    The IJ's Credibility Determination

Petitioners contend that they suffered past persecution in Kosovo on the basis of their political opinion and membership in the Democratic Party. In pertinent part, Petitioner argues that he was interrogated, detained, and beaten by Serbian police officers on numerous occasions. He alleges that his encounters with Serbian police resulted in injuries and that his wife was raped by Serbian police. Petitioners maintain that their testimony at the evidentiary hearing and corroborating evidence established their past persecution in Kosovo and support a reversal of the BIA decision. We find that Petitioners have failed to meet their burden of showing that they endured past persecution because their hearing testimony was vague and unsupported with independent evidence.

### 1.    The Nature and Quality of Petitioners' Testimony

The IJ identified specific inconsistencies in Petitioner's testimony that conflict with his asylum application. For example, in the asylum application, Petitioner indicated that he was "a member of the LDK [political party]." (J.A. 45) However, during the evidentiary hearing, Petitioner stated that "not only he was a member, but he was the leader . . . he got a promotion when he got his membership for this organization in his home village, and that he had thousands of people that he led." (J.A. 46) Petitioner proffered only vague and conclusory statements in support of this assertion, and failed to provide specific facts and details concerning the nature of his leadership role.

19

Although Petitioner claimed to have been interrogated, arrested, detained, and beaten on numerous occasions by Serbian police, he failed to proffer specific or detailed testimony concerning his alleged persecution in Kosovo; he was simply unable to explain or describe the circumstances surrounding his persecution. *See, e.g.*, J.A. 62 (noting that when Petitioner "was queried about his interrogations with the police . . . . he could not estimate the number of times; just many times."); J.A. 63 (noting that "[Petitioner] was asked [ ] how often [he was] questioned about the [political] party and [his] brothers" and he responded that "[he] cannot remember."); J.A. 63 ("When asked how often" he was beaten by the police, "[Petitioner] said, 'very' . . . . [and] refused to even estimate the number of times."). Petitioner failed to articulate meaningful responses to the questions he was asked at the hearing. Indeed, the record shows that Petitioner's testimony was cursory and without meaningful elaboration, and did not reveal details of, or insight into, why or how Petitioner was detained; his treatment during his detentions; the conditions of his detentions; and the questions he was asked during his interrogations. Petitioner's testimony is plainly vague and ambiguous. As the IJ stated, Petitioner's testimony about his past experiences in Kosovo was "vague and his memory [was] completely off base." (J.A. 63) We find that the IJ properly denied the asylum applications because Petitioner's vague, conclusory and inconsistent statements support a finding that his testimony was not credible.

### 2.  Independent Evidence

The IJ concluded that Petitioner failed to corroborate his testimony with independent evidence. The record indicates that Petitioner produced some independent evidence, including the testimony of his brothers and a statement, or letter, from his parents.

Although Petitioner's brothers testified on behalf of Petitioners, they offered only vague and conclusory testimony about Petitioner being "almost beat [ ] to death" and Petitioner's wife being "sexually abused." (J.A. 57)  The testimony did not provide specific facts or details to corroborate Petitioner's alleged persecution.  Rather, the brothers' testimony raised facts not discussed in the asylum applications.  *See, e.g., id.* (noting that the asylum applications do not "mention[ ] any discrete harm, injury, abuse to the wife directly" and that the brothers' testimony was "the first mention of anything that would indicate that [Petitioner's] wife . . . had been sexually abused in any manner.").  Since the testimony proffered by Petitioner's brothers does not support the allegations set forth in the asylum applications, the testimony cannot be given great weight.

With respect to the statement from Petitioner's parents, the IJ found that the letter "completely torpedoes [Petitioner's] credibility." (J.A. 55)  The IJ found that the statement was "fraudulent, false, and the applicant should have known that if he had even read the letter when it came in." *Id.*  He indicated that the provenance of the statement was suspect and that Petitioners "could not tell the Court whether th[e] [statement] ha[d] ever been mailed to the United States." (J.A. 54)  Indeed, the record shows that although Petitioner's parents live in Kosovo, "th[e] document was faxed from Italy," and that "[n]o one could explain [ ] how [it] was faxed from Italy." *Id.*  The contents of the statement also contradicted Petitioner's testimony because it indicated that

> in the year of 1999 and in order to avoid being conscripted by the KLA . . . [Petitioner] has moved illegally to the United States.  It also says that during and after the war [Petitioner] has been chased by the KLA . . . in order to become a member of [the KLA], whereas after the war . . . [Petitioner has been chased by the KLA] as a fugitive and deserter.

(J.A. 55) Petitioner did not leave Kosovo in 1999, he left in 1998; and he is seeking asylum because of alleged persecution perpetrated by the Serbian law enforcement authorities in connection with his political activities with the Democratic Party, not because of KLA persecution. Petitioner failed to reconcile these inconsistencies at the evidentiary hearing.

The record shows that Petitioners failed to adequately connect the corroborating evidence to their testimony. Simply put, Petitioners failed to proffer adequate independent evidence to corroborate their allegations of past persecution. We find that independent evidence fails to substantiate Petitioners' testimony. The IJ properly denied Petitioners' asylum applications because the testimony lacked meaningful independent evidence.

**D.    Reasonable Fear of Future Persecution**

In this case, Petitioners are not entitled to a rebuttable presumption that they have a well-founded fear of future persecution because Petitioner failed to establish past persecution. 8 C.F.R. § 208.13(b)(1)(I); *see also Ouda*, 324 F.3d at 455. Since Petitioner "did not sustain his burden of establishing that he suffered past persecution, he [is] not entitled to the presumption under 8 C.F.R. § 208.13(b)(1)(i) of a well-founded fear of suffering future persecution." *Mikhailevitch*, 146 F.3d at 389; *see also Ouda*, 324 F.3d at 455.

**E.    Application for Withholding of Removal**

To be eligible for withholding of removal, Petitioners must show that it is more likely than not that they will be persecuted on account of race, religion, nationality, membership in a particular social group or political opinion. *See, e.g.*, 8 U.S.C. § 1231(b)(3); *see also* 8 C.F.R. § 1208.16(b). "[I]n order to qualify for withholding of removal, the petitioner[s] must establish that there is a clear

22

probability that [they] will be subject to persecution if forced to return to [Kosovo]." *Sarr v. Gonzales*, 485 F.3d 354, 361-62 (6th Cir. 2007) (internal quotation marks and citations omitted). Petitioners "must demonstrate that it is more likely than not that he or she will be persecuted upon return" to Kosovo. *Id.* (internal quotation marks and citations omitted). Petitioners have failed to set forth specific facts and evidence that they have suffered past persecution. The testimony does not support a finding that Petitioners have a well-founded fear of future persecution. Therefore, we find that any relief under withholding of removal was properly denied.

### F.      Application for Protection Under the Torture Convention

Under the Torture Convention, Petitioners have the burden of showing that it is more likely than not that they will be tortured. 8 C.F.R. § 1208.16(c)(2); *see also Ali v. Reno*, 237 F.3d 591, 596 (6th Cir. 2001). In pertinent part, torture is defined as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or her or a third person information or a confession, punishing him or her for an act he or she or a third person has committed or is suspected of having committed, or intimidating or coercing him or her or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

8 C.F.R. § 1208.18(a); *see also Mostafa v. Ashcroft*, 395 F.3d 622, 625 (6th Cir. 2005). The Torture Convention prohibits the return "of an alien to a country where it is more likely than not that he will be subject to torture by a public official, or at the instigation or with the acquiescence of such an official." *In re G-A-*, 23 I. & N. Dec. 366, 367 (BIA 2002) (citations omitted). Petitioner argues that he was interrogated and beaten by Serbian police officers on numerous occasions, and that his wife

23

was raped. Since the testimony concerning the detentions, interrogations, beatings, and rape was vague and unspecific, Petitioners have failed to meet their burden of proof that they were tortured in Kosovo. *See, e.g.*, *Neziraj v. Gonzales*, 207 F. App'x 550, 559 (6th Cir. 2006) (unpublished case). We find that any relief under the Torture Convention was properly denied.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the BIA's decision and **DENY** the petitions for review.

**ALICE M. BATCHELDER, Circuit Judge, concurring.** I concur in full with Sections I and II of the lead opinion, discussing the BIA's denial of Petitioners' three motions to reopen. I agree with the lead opinion's conclusion that Petitioners did not satisfy the procedural *Lozada* requirements for bringing an ineffective assistance of counsel claim in an immigration proceeding. Because it is clear that Petitioners did not comply with the *Lozada* requirements, I find it unnecessary to reach the merits of Petitioners' ineffective assistance claim and do not join the lead opinion's discussion of the merits, found in Section III.